DAVID L. HENKIN #6876
HARLEY M. BROYLES #11640
EARTHJUSTICE
850 Richards Street, Suite 400
Honolulu, Hawaiʻi 96813
T: (808) 599-2436
Email: dhenkin@earthjustice.org
hbroyles@earthjustice.org

CHRISTOPHER D. EATON
(*pro hac vice*)
EARTHJUSTICE
810 3rd Avenue, Suite 610
Seattle, Washington 98104
T: (206) 343-7340
Email: ceaton@earthjustice.org

JOSEPH V. LANGKILDE III
(*pro hac vice*)
EARTHJUSTICE
1250 I Street NW, Fourth Floor
Washington, DC 20005
T: (202) 667-4500
Email: jlangkilde@earthjustice.org

Attorneys for Plaintiffs

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF HAWAIʻI

| | |
|---|---|
| FALEULA O LE MANUʻATELE, FAʻASAO AMERIKA SAMOA, and CONSERVATION COUNCIL FOR HAWAIʻI,<br><br>Plaintiffs,<br><br>v.<br><br>MARINE MINERALS ADMINISTRATION and DOUG BURGUM, in his official capacity as Secretary of the Department of Interior,<br><br>Defendants. | CIVIL NO. CV-26-543 JAO-KJM<br><br>AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF; EXHIBITS A–B |

AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiffs Faleula o le Manuʻatele, Faʻasao Amerika Samoa, and Conservation Council for Hawaiʻi (collectively, Plaintiffs) hereby complain of the actions of Defendants Marine Minerals Administration and Secretary of the Department of Interior Doug Burgum as follows:

INTRODUCTION

1. The United States has never before sold rights to submerged public lands on American Samoa's outer continental shelf. On November 19, 2026, the Marine Minerals Administration (MMA) plans to sell leases under the Outer Continental Shelf Lands Act (OCSLA) allowing deep-sea mining of over 31 million acres of seabed off American Samoa.

2. Deep-sea mining entails using heavy machinery to scour the seabed for potato-sized mineral aggregations called polymetallic nodules or, in some cases, to strip mine mineral-laden crusts from the sea floor. Operations can destroy nearly all life in their path, introduce toxic substances into the food web, smother ecosystems across broad swaths of ocean, and cause multiple harms to marine mammals, sea turtles, tunas, and other wildlife.

3. These impacts threaten the health of marine ecosystems that feed Samoan households, protect shorelines, and form the basis of many Samoan cultural practices. The Samoan people and village governments throughout

American Samoa rely on healthy oceans and observe traditional marine management practices to ensure that their oceans are abundant, such as banning overfishing and prohibiting harm of marine mammals, sea turtles, sharks, and other wildlife. Deep-sea mining off American Samoa's shores would fatally undermine these practices.

4. Despite the harmful impacts to the environment and Samoans' way of life, MMA is barreling forward with unprecedented seabed mining leasing in violation of vital laws meant to protect the lands and waters in American Samoa. Faleula o le Manuʻatele, Faʻasao Amerika Samoa, and Conservation Council for Hawaiʻi thus bring this challenge to MMA's Final Leasing Notice because it exceeds MMA's legal authority and it violates OCSLA, the Endangered Species Act (ESA), and the National Environmental Policy Act (NEPA).

5. First, MMA lacks legal authority to sell mineral leases off American Samoa. The Samoan leaders who ceded Samoan lands and waters to the United States signed two treaties, the Instruments of Cession, with the United States and secured the promise that the federal government would pay fair consideration for the use of "land, or any other thing" in American Samoa. In 1929, through the 1929 Ratification Act, Congress ratified that promise, stipulated that the United States' public land laws shall not apply to American Samoa, and established that the management and disposition of the ceded lands and waters by the federal

government can occur only via "special laws" that direct "all revenue from or proceeds of" those lands and waters for use "solely for the benefit of the inhabitants" of American Samoa. Congress has never passed the special law required to sell rights to submerged public lands in American Samoa. And OCLSA does not give MMA authority to sell such rights because it is a general public land law that directs *none* of the revenue from leasing to benefit the people of American Samoa.

6. Further, OCSLA itself does not authorize mineral leasing of the outer continental shelf of any U.S. territory, including American Samoa. Congress' 2022 amendment of OCSLA to provide for only offshore wind leasing in territories did not convey to MMA the authority to sell deep-sea mining leases. Even if MMA had statutory authority for the sale—and it does not—its Final Leasing Notice is contrary to MMA's regulations, which do not allow for mineral leasing of the outer continental shelf of any U.S. territory.

7. Second, MMA violated NEPA by relying on an environmental assessment that unlawfully omits the lion's share of the lease sale's effects, excluding all impacts of post-leasing exploration, testing, development, and mining. Not only did MMA ignore the effects of the seabed mining activities that its lease sale aims to produce, but it unlawfully limited its options to an all-or-nothing leasing proposal on the irrational theory that selling a smaller area or

avoiding environmentally sensitive habitats would do nothing to reduce environmental impacts.

8. Finally, MMA has not complied with the ESA. Before deciding to hold the lease sale, MMA was required to complete consultation with the National Marine Fisheries Service (NMFS) under ESA section 7(a)(2), 16 U.S.C. § 1536(a)(2), to ensure that deep-sea mining activities would not push any endangered or threatened species closer to extinction or destroy the critical habitat that those species need to survive and eventually recover. NMFS issued a letter of concurrence concluding that the sale is not likely to adversely affect any protected species or critical habitat, but unlawfully omitted the effects of nearly all deep-sea mining activities from its evaluation. MMA's reliance on an illegal letter of concurrence to proceed with the sale violates the ESA.

9. Plaintiffs therefore ask this Court to declare that MMA's Final Leasing Notice exceeds MMA's lawful authority, is arbitrary and capricious, an abuse of discretion, and contrary to law, in violation of the Administrative Procedure Act (APA), the Instruments of Cession, the 1929 Ratification Act, OCSLA, NEPA, and the ESA, and to vacate the Final Leasing Notice.

## JURISDICTION AND VENUE

10. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question jurisdiction), 28 U.S.C. § 1361 (actions to compel officers

and agencies of the United States to perform their duty), 28 U.S.C. §§ 2201–2202 (power to issue declaratory judgments in cases of actual controversy), and 5 U.S.C. §§ 701–706 (actions under the APA).

11. Venue is proper in this district under 28 U.S.C. § 1391(e)(1) because this is a civil action in which officers or employees of the United States or an agency thereof are acting in their official capacity or under color of legal authority and a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this judicial district and also because Plaintiff Conservation Council for Hawai'i resides in this judicial district.

12. This Court has authority to grant Plaintiffs' requested relief pursuant to the APA, 5 U.S.C. § 706(2), and the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202.

13. Plaintiffs Fa'asao Amerika Samoa and Conservation Council for Hawai'i served written notice pursuant to 16 U.S.C. § 1540(g)(2)(A) on Defendants and the Secretary of Commerce 60 days prior to bringing the ESA claim in this action.

14. The Court has authority to award costs and attorneys' fees under 28 U.S.C. § 2412 and 16 U.S.C. § 1540(g)(4).

PARTIES

15. Plaintiff FALEULA O LE MANUʻATELE (Manuʻa Council) is the council of *matai* (chiefs or traditional leaders) that retains control over and governs the lands and waters that are connected to Manuʻa, which includes the islands of Taʻu, Ofu, Olosega, and Muliava (also called Rose Atoll).

16. For over a millennium, each village in Manuʻa has selected member *matai* to serve on the Manuʻa Council, which in turn has maintained and managed, and continues to maintain and manage, the *faʻasamoa* (Samoan way of life) in Manuʻa. The Manuʻa Council's member *matai* and constituents live, farm, fish, and engage in traditional activities in the lands and waters that surround their islands. And the Manuʻa Council regulates and coordinates these subsistence efforts to ensure that its member *matai* and constituents have enough food to eat and safe water to drink.

17. This traditional way of life centers on communal living and is predicated on utilizing the lands and waters in Manuʻa to meet daily needs. Given the lack of reliable imports into Manuʻa and the small land base of the islands, healthy and abundant marine ecosystems in the oceans around Manuʻa are vital to the Manuʻa Council, its member *matai*, and its constituents.

18. In 1904, the Manuʻa Council, together with the *Tuimanuʻa* (King of Manuʻa), ceded the lands that MMA plans to lease for deep-sea mining. For over a

thousand years prior to this cession, and to this day, the Manuʻa Council's member *matai* and constituents regularly visit, fish, and recreate in ceded areas near the lease area, and derive recreational, aesthetic, cultural, and spiritual benefits from those activities. To feed themselves and their families, these members and constituents catch fish that are present within and that travel through the lease area. Still other members and constituents observe as part of cultural practices sacred marine species that are present within and travel through the lease area.

19. The Manuʻa Council's interests in maintaining Manuʻa's lands and waters will be harmed by deep-sea mining-related activities in and around the lease area. The Manuʻa Council's members' and constituents' use and enjoyment of marine species will also be harmed by deep-sea mining-related activities in the lease area.

20. For example, a member of the Manuʻa Council holds the same position and title as a member of the 1904 Manuʻa Council that signed the 1904 treaty ceding Manuʻa lands and waters. Like his predecessor in 1904, this member was selected by his village to represent and protect his village's interests. These interests include his and his village's treaty-protected property and governance interests in the lands and waters in and around Manuʻa, interests in consuming healthy fish (including pelagic species), and interests in observing sacred marine beings like sea turtles, whales, and sharks. To ensure that his and his village's

interests in these areas, fish, and beings are protected, this member works with other members of the Manu‘a Council to regulate fishing and other aspects of marine and land management in and around Manu‘a.

21. This member and his constituents possess treaty-protected property and governance interests in the lands and waters within the lease area. Additionally, the pelagic species and sacred marine beings on which this member and his constituents rely travel within and throughout the lease area. The lease sale will harm this member's and his village's treaty-protected property and governance interests in the lands and waters in the lease area by selling leases without providing compensation to any village government in Manu‘a and without managing the lease area in line with the treaties that the Manu‘a Council executed with the United States. In addition, seabed mineral exploration, testing, development, and mining will harm marine species populations in the lease area and around American Samoa, making it more difficult to catch healthy fish and observe sacred beings, and thereby injuring this member's interest in consuming healthy fish, observing healthy, sacred marine species, and protecting his constituents' interests in doing the same.

22. Plaintiff FA‘ASAO AMERIKA SAMOA (FAS) is a non-profit community organization incorporated in Hawai‘i and based in American Samoa. FAS's mission is to safeguard American Samoa's culture, traditions, and natural

resources from exploitation, and, in doing so, preserve Samoan culture and traditions that are deeply interconnected with the land and sea in American Samoa.

23. FAS members include scientists, educators, fishers, and *matai* who live in American Samoa, who regularly visit, study, work, and recreate in areas near the lease area, and who derive recreational, professional, scientific, educational, aesthetic, cultural, and spiritual benefits from those activities. These members catch fish that are present within and travel through the lease area to feed themselves and their families. These members also study and observe ESA-listed species that are present within and travel through the lease area. FAS members' use and enjoyment of these species will be harmed by deep-sea mining-related activities in the lease area.

24. For example, one of FAS's members is a coral ecologist who lives in American Samoa. She researches coral resiliency in American Samoa and is currently working on projects: to grow heat-tolerant corals; to monitor coral health impacted by bleaching and marine debris; and to sample, identify, and categorize corals in American Samoa's marine waters. These projects include work to survey and identify ESA-listed corals in American Samoa, including *Isopora crateriformis* and *Acropora globiceps*. She has participated in scientific research trips to Muliava—which is immediately adjacent to the lease area—and has plans to return in the next year to build out a taxonomy of the corals present in American

Samoa. In addition to relying on healthy corals for her scientific studies, this member derives pleasure from observing and photographing healthy corals, including ESA-listed corals in American Samoa. Seabed mining and mineral exploration off American Samoa threaten to harm the corals and their ecosystems that this member studies and observes, thereby injuring her professional, scientific, and aesthetic interests.

25. Another FAS member is a conservation educator who lives in American Samoa. She has visited Muliava to conduct foundational *i'a sa* ("sacred fish," referring to sea turtles) population surveys. She teaches place-based science lessons to youth, which involve observing sacred Samoan animals like ESA-listed sea turtles in the oceans around American Samoa. Seabed mining and mineral exploration will harm these sea turtle populations, making it more difficult for her to carry out her place-based education, thereby injuring her professional, cultural, and aesthetic interests.

26. A third FAS member is a subsistence fisherman who lives on the island of Ta'u in Manu'a. This member relies on his catch to feed himself, his family, and his village. He fishes both from the shore in Manu'a and far from shore on his boat to catch pelagic fish like tuna. The pelagic species on which this member relies travel within and through the lease area. Seabed mining and mineral exploration will harm the fish populations on which this member relies,

making it more difficult to catch healthy fish and thereby injuring his interest in feeding himself and his family.

27. Plaintiff CONSERVATION COUNCIL FOR HAWAIʻI (CCH) is a non-profit citizens' organization incorporated and based in Hawaiʻi with approximately 4,000 members in Hawaiʻi, the United States mainland, and foreign countries. CCH is the Hawaiʻi affiliate of the National Wildlife Federation, a non-profit membership organization with over 5.8 million members and supporters nationwide.

28. CCH's mission is to protect Hawaiʻi's native wildlife, including threatened and endangered species, and to restore the ecosystems on which those species depend for future generations. The wildlife species that CCH has worked to protect include ESA-listed species of whales, sea turtles, sharks, rays, and seals that are found in American Samoa's and Hawaiʻi's waters. CCH's members' interests in these species will be harmed by allowing deep-sea mining-related activities in and around the lease area in American Samoa, as well as by associated increased vessel traffic in Hawaiʻi's waters.

29. CCH members include marine biologists and cultural practitioners who regularly visit, study, work, and recreate in marine waters within and near the lease area and in Hawaiʻi that would be affected by deep-sea mining-related activities. CCH members study, enjoy, and benefit from the threatened and

endangered species in waters over American Samoa's outer continental shelf and in the affected waters around Hawai'i—including, but not limited to, ESA-listed whales, sea turtles, sharks, and rays that migrate between the two areas—for recreational, professional, scientific, educational, aesthetic, spiritual, and cultural purposes. CCH members' use and enjoyment of the marine environment around American Samoa and around Hawai'i will be harmed by deep-sea mining and mineral exploration activities on the planned leases.

30. For example, one of CCH's members has conducted extensive scientific research regarding the marine environment around American Samoa for more than two decades. This member previously participated in two scientific research trips to the Rose Atoll Marine National Monument to study ESA-listed corals. He is currently working on a study of coral reef health using data collected on ESA-listed corals in American Samoa (particularly *Acropora globiceps*, *Acropora retusa*, *Acropora speciosa*, *Fimbriaphyllia paradivisa*, and *Isopora crateriformis*), which will involve additional research trips to Muliava during the next two years. In addition to relying on healthy corals for his scientific studies, this member derives pleasure from observing and photographing healthy corals. Deep-sea mining and mineral exploration activities off American Samoa threaten to harm the ESA-listed corals and their ecosystems that this member studies and observes, thereby injuring his professional, scientific, and aesthetic interests.

31. Another one of CCH's members is a Native Hawaiian professional diver and cultural practitioner who has observed and studied—and will continue to observe and study—ESA-listed species in the ocean surrounding the Hawaiian Islands. This member has a cultural and spiritual connection to the ESA-listed species that occur in Hawai'i's waters that will be affected by deep-sea mineral exploration and mining activities in American Samoa. This member regularly takes friends and family on nearshore diving tours to *kilo* (Native Hawaiian observational technique) for Central North Pacific green sea turtles, hawksbill turtles, giant Pacific manta rays, Hawaiian monk seals, and oceanic whitetip sharks. This member also regularly ventures on boats to deeper waters around the Hawaiian Islands to *kilo* for species including false killer whales, sperm whales, olive ridley sea turtles, and leatherback sea turtles. This member has a deep cultural and familial connection to Hawai'i's sharks, including the oceanic whitetip shark, which he regards as *'aumakua* (embodiment of ancestral guardians), and which his family and ancestors, with lineage as *kahu manō* (shark keepers), have advocated to protect since time immemorial. Deep-sea mining-related activities in American Samoa, as well as related vessel traffic in Hawai'i's waters, threaten to harm the ESA-listed species that this member observes (many of which are highly migratory), thereby injuring his cultural, spiritual, and aesthetic interests.

32. MMA's failure to comply with the Instruments of Cession, the 1929 Ratification Act, OCSLA, NEPA, the ESA, and the APA has caused and is causing harm to Plaintiff Manu'a Council's treaty-protected property interests in the lease area and its governance interests in maintaining the *fa'asamoa* in Manu'a. These violations have also caused and are causing harm to Plaintiffs' members' subsistence, professional, scientific, educational, aesthetic, spiritual, and cultural interests in marine species and ecosystems in American Samoa's and Hawai'i's waters. Finally, these violations have caused and are causing harm to Plaintiffs' members' interests in eating healthy pelagic fish species that are free of the contaminants associated with deep-sea mining related activities.

33. The interests of Plaintiffs and Plaintiffs' members have been, are being, and will be adversely affected by MMA's violation of federal law, as described herein. These harms can be remedied only if the Court vacates the Final Leasing Notice and orders MMA to comply fully with the Instruments of Cession, the 1929 Ratification Act, OCSLA, NEPA, the ESA, and the APA. Plaintiffs have no other adequate remedy at law.

34. Defendant MARINE MINERALS ADMINISTRATION is the federal agency within the U.S. Department of Interior to which the Secretary has delegated

authority to hold mineral lease sales under OCSLA.[1] Among other requirements, MMA is required to comply with the Instruments of Cession, the 1929 Ratification Act, OCSLA, NEPA, and the ESA when taking any action affecting the environment.

35. Defendant DOUG BURGUM is sued in his official capacity as the Secretary of the Interior. In that capacity, Secretary Burgum is responsible for implementing OCSLA and ensuring that the Department of Interior and its constituent agencies (including MMA) comply with applicable law.

## LEGAL FRAMEWORK

### I. INSTRUMENTS OF CESSION

36. At the turn of the twentieth century, the United States executed two treaties with Samoan leaders and village governments to bring certain Samoan islands and waters into the United States' fold.

37. In 1900, *matai* in Tutuila and Aunu'u signed the first of these treaties with the United States for the "promotion of the peace and welfare of the people of

[1] The Secretary of the Interior recently merged BOEM and the Bureau of Safety and Environmental Enforcement into a single agency, the Marine Minerals Administration. *See* Secretarial Order 3451, "Establishment of the Marine Minerals Administration" (July 10, 2026) *https://www.doi.gov/sites/default/files/document_secretarys_orders/somarinemineralsadministration_final_508.pdf*. The applicable regulations and challenged agency documents sometimes refer to BOEM. This Complaint will use the current name of the agency (MMA) rather than BOEM.

said islands, for the establishment of a good and sound government, and for the preservation of the rights and property of the inhabitants of said islands." Instrument of Cession by the Representatives of the People of Tutuila, Tutuila–U.S., Apr. 17, 1900 [hereinafter 1900 Treaty, attached as Exhibit A]. The leaders of village governments in Tutuila and Aunu'u ceded "the islands of Tutuila and Aunuu [sic] and all other islands, rocks, reefs, foreshores and waters lying between the thirteenth degree and the fifteenth degree of south latitude and between the one hundred and seventy-first degree and the one hundred sixty-seventh degree of west longitude from the Meridian of Greenwich" in exchange for the commitment that, "if the [United States] shall require any land or any other thing for Government uses, the Government may take the same upon payment of a fair consideration for the land or other thing to those who may be deprived of their property on account of the desire of the Government." *Id.* The United States also guaranteed that the "Chiefs of the towns will be entitled to retain their individual control of the separate towns." *Id.*

38. In 1904, the Manu'a Council and Tuimanu'a Elisara signed the second treaty with the United States. These leaders ceded the "Islands of the Manua [sic] Group, being the whole of eastern portion of the Samoan Islands lying east of longitude 171 degrees west of Greenwich and known as Tau [sic], Olosega, Ofu, and Rose Island, and all other, the waters and property and adjacent thereto."

Instrument of Cession by the Representatives of the People of Manu'a, Manu'a–U.S., Jul. 16, 1904 [hereinafter 1904 Treaty, attached as Exhibit B]. In exchange, the United States promised that the "rights of the Chiefs in each village and of all people concerning their property according to their customs shall be recognized." *Id.*

II. 1929 RATIFICATION ACT

39. In 1929, Congress "accepted, ratified, and confirmed" the 1900 Treaty and 1904 Treaty (collectively, the Instruments of Cession). Pub. Res. No. 70-89, ch. 281, 45 Stat. 1253 (1929) (codified at 48 U.S.C. § 1661).

40. In ratifying the treaties, Congress provided that the "existing laws of the United States relative to public lands shall not apply to such lands in the said islands of eastern Samoa." 48 U.S.C. § 1661(b) [hereinafter 1929 Ratification Act]. Instead, the 1929 Ratification Act specified that Congress "shall enact special laws for their management and disposition: Provided, That all revenue from or proceeds of the same, except as regards such part thereof as may be used or occupied for the civil, military, or naval purposes of the United States or may be assigned for the use of the local government, shall be used solely for the benefit of the inhabitants of the said islands of eastern Samoa for educational and other public purposes." *Id.*

## III. OUTER CONTINENTAL SHELF LANDS ACT

41. In 1953, Congress enacted OCSLA "[t]o provide for the jurisdiction of the United States over the submerged lands of the outer Continental Shelf, and to authorize the Secretary of the Interior to lease such lands for certain purposes." Pub. L. No. 83-212, Ch. 345, 67 Stat. 462 (1953). OCSLA is codified in the "Public Lands" title of the United States Code: Title 43. 43 U.S.C. § 1331 *et seq.*

42. OCSLA governs the leasing, exploration, and development of minerals on the "Outer Continental Shelf." *See generally id.* Prior to the enactment of the Inflation Reduction Act in 2022, OCLSA defined the Outer Continental Shelf as the seabed extending from the outer boundary of "navigable waters"—defined as tidal waters out to (generally) three miles from the coastline of a "State"—to the outer boundary of the United States' Exclusive Economic Zone, 200 nautical miles from shore. *Id.* §§ 1301(a)(2), 1331(a) (2021); 48 Fed. Reg. 10605 (Mar. 14, 1983).

43. OCSLA authorizes the Secretary of the Interior to sell "leases of any mineral other than oil, gas, and sulphur in any area of the outer Continental Shelf." 43 U.S.C. § 1337(k) (2026); *see* 30 C.F.R. § 581.0–.47. The sale of any mineral must be done in accordance with the provisions of OCSLA, 43 U.S.C. § 1333(a)(1)(B), and in "compliance with regulations issued under" OCSLA, *id.* § 1334(b); *see also id.* § 1337(*l*). OCSLA requires that "[a]ll rentals, royalties, and

other sums … shall be deposited in the Treasury of the United States and credited to miscellaneous receipts." *Id.* § 1338.

44. Before holding a lease sale, MMA "shall conduct a study of any area or region included in [the sale] in order to establish information needed for assessment and management of environmental impacts on the human, marine, and coastal environments of the outer Continental Shelf and the coastal areas which may be affected by … mineral development in such area or region." *Id.* § 1346(a)(1). MMA must commence the required study "not later than six months prior to the holding of a lease sale." *Id.* § 1346(a)(2).

45. Upon receiving a lease, the holder may conduct "preliminary activities," which include "bathymetric, geological, geophysical, mapping, and other surveys." 30 C.F.R. § 582.21(d).

46. Lessees then conduct further exploration, testing, and development activities "in accordance with a plan submitted by the lessee and approved by the Director" of MMA. *Id.* § 582.21(a). "Exploration" includes geophysical surveys, drilling, and sampling of mineral deposits. *Id.* § 582.3. "Testing" includes "removing bulk samples for processing tests and feasibility studies and/or the testing of mining equipment." *Id.* "Development" includes "geophysical activities, drilling, construction of offshore facilities, and operation of all onshore

support facilities" in preparation for production of minerals. *Id.* "Production" is the mining and processing of minerals from the seabed. *See id.* § 582.24.

47. In the Inflation Reduction Act of 2022, Congress amended OCSLA to allow for offshore wind development in waters around U.S. territories through a section titled "Part 5—Offshore Wind." *Inflation Reduction Act of 2022*, Pub. L. No. 117-169, 136 Stat. 2054–55 [hereinafter the Offshore Wind Amendment].

48. The Offshore Wind Amendment specifies that the Secretary of the Interior "may conduct wind lease sales in each area within the exclusive economic zone of the United States adjacent to the Commonwealth of Puerto Rico, Guam, American Samoa, the United States Virgin Islands, or the Commonwealth of the Northern Mariana Islands" subject to certain conditions. 136 Stat. at 2055; 43 U.S.C. § 1356c(a)(2). It explicitly excludes these territories from oil and gas leasing. 136 Stat. at 2055; *see* 43 U.S.C. § 1344(i). The Inflation Reduction Act did not amend or otherwise reference OCSLA's authorization for mineral leasing, which is set forth in 43 U.S.C. § 1337(k).

49. To enable offshore wind leasing, Congress amended OCSLA's definition of "State" to include each of the territories, 136 Stat. at 2055 (codified at 43 U.S.C. § 1331(r)(2)–(6)), and amended the definition of "outer Continental Shelf" to include submerged lands "within the exclusive economic zone of the

United States and adjacent to any territory of the United States," *id.* at 2054–55 (codified at 43 U.S.C. § 1331(a)).

50. Following Congress's enactment of the Offshore Wind Amendment, MMA published a direct final rule to "conform[] [MMA's] regulations to the updated version of OCSLA." 88 Fed. Reg. 68460, 68461 (Oct. 4, 2023). MMA explained that, "[t]o satisfy these new OCSLA requirements, [MMA] is incorporating the revised definitions of 'outer Continental Shelf' and 'State' into its existing regulations governing offshore wind energy leasing." *Id.* at 68460 (codified at 30 C.F.R. § 585.113).

51. MMA did not amend its mineral leasing regulations (30 C.F.R. pt. 581) in response to the Offshore Wind Amendment. The mineral leasing regulations continue to define the "Outer Continental Shelf" that is subject to mineral leasing as "all submerged lands lying seaward and outside of the area of lands beneath navigable waters as defined in section 2 of the Submerged Lands Act (43 U.S.C. 1301)." 30 C.F.R. § 581.3. Section 2 of the Submerged Lands Act defines "lands beneath navigable waters" with reference to waters seaward of each "State," where "State" means only a "State of the Union." 43 U.S.C. § 1301(a)(2), (g). Accordingly, the definition of "Outer Continental Shelf" in MMA's mineral leasing regulations does not include submerged lands lying seaward of any territory.

## IV. NATIONAL ENVIRONMENTAL POLICY ACT

52. Congress enacted NEPA to "promote efforts which will prevent or eliminate damage to the environment," 42 U.S.C. § 4321, and ensure that federal agencies incorporate environmental concerns into their decision-making process, *id.* § 4331(a)–(b). To that end, NEPA compels agencies to evaluate prospectively the environmental impacts of proposed actions that they carry out, fund, or authorize and give the public a meaningful opportunity to participate in the decision-making process.

53. NEPA requires all agencies of the federal government to prepare a "detailed statement" regarding all "major federal actions significantly affecting the quality of the human environment." *Id.* § 4332(2)(C). This statement must describe: "(i) reasonably foreseeable environmental effects of the proposed agency action; (ii) any reasonably foreseeable adverse environmental effects which cannot be avoided should the proposal be implemented; (iii) a reasonable range of alternatives to the proposed agency action … that are technically and economically feasible, and meet the purpose and need of the proposal; (iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity; and (v) any irreversible and irretrievable commitments of Federal resources which would be involved in the proposed agency action should it be implemented." *Id.*

54. While an agency may prepare an environmental assessment in certain circumstances, OCLSA requires preparation of a full environmental impact statement" at the lease-sale stage. *See* 42 U.S.C. § 4336(b)(1), (2); 43 U.S.C. § 1346(a)(1).

55. NEPA requires the agency to evaluate all effects that are reasonably foreseeable and have a reasonably close causal relationship to the proposed action. 42 U.S.C. § 4332(2)(C)(i); *see* U.S. Dep't of the Interior, *516 DM 1 – U.S. Department of the Interior Handbook of National Environmental Policy Act Implementing Procedures* 24 (2026) [hereinafter *NEPA Handbook*]. This includes "[b]oth short- and long-term effects" of the proposed action, as well as effects of "any connected actions." *NEPA Handbook* at 4.

56. A connected action is one that is "a separate Federal action within the authority of a Federal agency that is closely related to the proposed action and should be addressed in a single environmental document because the proposed agency action: (1) Automatically triggers the separate Federal action, which independently would require the preparation of additional environmental documents; (2) Cannot proceed unless the separate Federal action is taken previously or simultaneously; or (3) Is an interdependent part of a larger Federal action that includes a separate Federal action, which mutually depend on the larger Federal action for their justification." *Id.* at 23.

57. NEPA requires an agency to consider a reasonable range of alternatives to its proposed action that is sufficient to enable the agency to make an informed choice of action. 42 U.S.C. § 4332(2)(C)(iii), (H).

58. The scope of alternatives that must be considered is guided by the purpose and need of the project. *Id.* § 4332(2)(C)(iii). However, an agency may not define its action's objectives so unreasonably narrowly that only one alternative from among the environmentally preferred ones would accomplish the stated purpose and need.

## V. ENDANGERED SPECIES ACT

59. Congress enacted the ESA in 1973 in response to the extinction crisis to "provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, [and] to provide a program for the conservation of such endangered species and threatened species." 16 U.S.C. § 1531(b).

60. The ESA's "language, history, and structure … indicate[] beyond doubt that Congress intended endangered species to be afforded the highest of priorities." *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 174 (1978). "The plain intent of Congress in enacting [the ESA] was to halt and reverse the trend toward species extinction, whatever the cost." *Id.* at 184.

61. In broad strokes, the ESA seeks to protect and recover imperiled species and populations by first listing them as threatened or endangered based on enumerated statutory factors. 16 U.S.C. § 1533(a)(1)(A)–(E); *see id.* § 1532(6), (20). The Act further provides for the designation of critical habitat to protect areas essential to the survival and eventual recovery of threatened and endangered species. *Id.* § 1533(a)(3)(A)(i); *see id.* § 1532(5).

62. Section 7(a)(2) of the ESA then requires each federal agency, including MMA, to "insure that any action authorized, funded, or carried out by such agency … is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of [critical] habitat of such species." *Id.* § 1536(a)(2). "Jeopardize the continued existence of" is defined as engaging in an action that "reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species." 50 C.F.R. § 402.02. "Destruction or adverse modification means a direct or indirect alteration that appreciably diminishes the value of critical habitat as a whole for the conservation of a listed species." *Id.*

63. The ESA and its implementing regulations establish an interagency consultation process to assist federal agencies in complying with this duty. Each

agency, including MMA, must "review its actions at the earliest possible time to determine whether any action *may affect*" any endangered or threatened species or critical habitat. *Id.* § 402.14(a) (emphasis added). If so, the agency planning to undertake the action (the action agency) must consult the appropriate wildlife service—the U.S. Fish and Wildlife Service or, as here, NMFS—to ensure compliance with ESA section 7(a)(2)'s mandate. *See* 16 U.S.C. § 1536(a)(2); 50 C.F.R. §§ 402.01(b), 402.14.

64. In fulfilling the requirements of ESA section 7, both the action agency and the consulting wildlife agency must "use the best scientific and commercial data available." 16 U.S.C. § 1536(a)(2).

65. Moreover, when engaging in ESA section 7 consultation, the consulting wildlife agency must analyze the effects of the entire agency action, which include "the direct and indirect effects of an action on the species or critical habitat, together with the effects of other activities that are interrelated or interdependent with that action." 50 C.F.R. § 402.02.[2] "Indirect effects are those that are caused by the proposed action and are later in time, but still are reasonably

[2] On March 30, 2026, the U.S. District Court for the Northern District of California held that the definition of "effects of the action" promulgated in 2019 was facially invalid and reinstated the definition that was in effect prior to 2019. *Center for Biological Diversity v. U.S. Dep't of Interior*, Case No. 24-cv-04651-JST, 2026 WL 898264, at *15, *25 (N.D. Cal. Mar. 30, 2026).

certain to occur." 50 C.F.R. § 402.02. "Interrelated actions are those that are part of a larger action and depend on the larger action for their justification." *Id.* "Interdependent actions are those that have no independent utility apart from the action under consideration." *Id.*

66. To facilitate compliance with ESA section 7(a)(2), the action agency must prepare a biological assessment to "evaluate the potential effects of [its] action on listed and proposed species and designated and proposed critical habitat and determine whether any such species or habitat are likely to be adversely affected by the action." *Id.* § 402.12(a); *see also* 16 U.S.C. § 1536(c)(1).

67. As a general rule, the action agency must then engage in formal consultation with the consulting wildlife agency, unless the action agency determines and the consulting wildlife agency concurs in writing that the action is "not likely to adversely affect" any listed species or critical habitat. 50 C.F.R. §§ 402.13(c), 402.14(a), (b)(1).

68. If the consulting wildlife agency concurs and makes a final determination that the action is not likely to adversely affect any listed species or critical habitat, "the consultation process is terminated, and no further action [under ESA section 7(a)(2)] is necessary." *Id.* § 402.13(c). The concurrence letter must, at a minimum, document the consulting wildlife agency's "analysis, based on review of all potential effects, direct and indirect." U.S. Fish & Wildlife Serv.

& Nat'l Marine Fisheries Serv., *Endangered Species Consultation Handbook* 3-12 (1998) [hereinafter *ESA Handbook*].

69. If the consulting wildlife agency does not concur that the action is not likely to adversely affect any listed species or critical habitat, then formal consultation is required. 50 C.F.R. § 402.14(a). Formal consultation involves a more comprehensive evaluation of the effects of the action that culminates in the consulting wildlife agency's biological opinion on whether the action is likely to jeopardize the continued existence of the species or to destroy or adversely modify critical habitat. 16 U.S.C. § 1536(b)(3)(A); 50 C.F.R. § 402.14(c)–(h).

70. If the consulting wildlife agency concludes in the biological opinion that the proposed action is likely to jeopardize a species, the agency must specify reasonable and prudent alternatives, if any, that would avoid the likelihood of jeopardy, or specify that no such alternatives exist. 16 U.S.C. § 1536(b)(3)(A); 50 C.F.R. § 402.14(h)(2). If the consulting wildlife agency concludes that the action is not likely to jeopardize the continued existence of the species, but that incidental take of a listed species will occur, the agency must produce a written "statement concerning incidental take" that "[s]pecifies the impact of incidental taking as the amount or extent of such taking" on the species. 50 C.F.R. § 402.14(i)(1)(i); *see* 16 U.S.C. § 1536(b)(4). An incidental take statement must also specify "reasonable and prudent measures" that are "necessary or appropriate to minimize

[the] impact of incidental taking on the species" and the "terms and conditions (including, but not limited to, reporting requirements) that must be complied with by the Federal agency" to implement the measures. 50 C.F.R. § 402.14(i)(1)(ii), (iv); *see* 16 U.S.C. § 1536(b)(4).

71. The ESA regulations provide for consultation to occur in stages "[w]hen the action is authorized by a statute that allows the [action] agency to take incremental steps toward the completion of the action." 50 C.F.R. § 402.14(k). When such a statute is involved, the consulting wildlife agency "shall, if requested by the [action] agency, issue a biological opinion on the incremental step being considered." *Id.* In its biological opinion, the consulting wildlife agency must "includ[e] its views on the entire action," *id.*—not just the first incremental step—and determine, among other things, whether "[t]here is a reasonable likelihood that the entire action will not violate [ESA] section 7(a)(2)." *Id.* § 402.14(k)(5).

72. Consultation for the first phase of an incremental step action must always be conducted formally, concluding with the consulting wildlife agency issuing a biological opinion. *See id.* § 402.14(k).

73. Compliance with the ESA's section 7 consultation requirement is essential to prevent later substantive violations of the ESA.

## VI. ADMINISTRATIVE PROCEDURE ACT

74. The APA confers a right of judicial review on any person who is adversely affected by agency action. 5 U.S.C. § 702.

75. The APA provides that the reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be—(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; … (C) in excess of statutory jurisdiction, authority, or limitations; [or] (D) without observance of procedure required by law." *Id.* § 706(2).

# STATEMENT OF FACTS

## I. THE OCEANS AROUND AMERICAN SAMOA PROTECT AND FEED SAMOAN HOUSEHOLDS.

76. For over a millennium, the Samoan people have relied on their oceans to meet their needs. This remains true to this day, especially in Manuʻa. Nearly every household in Manuʻa relies on subsistence activities like fishing to meet their daily needs. This in part because Manuʻa lacks consistent imports, but also because the Manuʻa people value living the *faʻasamoa*, which places tremendous importance on nourishing their connection to their lands, waters, and communities.

77. Manuʻa residents engage in a variety of different methods of fishing to feed themselves, their families, and their villages. Fishermen in each village fish on the shorelines, as well as farther offshore from boats to catch pelagic species. Many of these fishermen comply with the *faʻasamoa*'s prohibition against

the commercialization of resources and do not sell their catch when distributing it throughout the village.

78. Without separate income flows or reliable imports, the fishermen and their villages thus rely heavily on an ocean that is abundant, healthy, and capable of providing sustenance.

79. An abundant marine ecosystem is likewise important for fishermen who do sell their catch to meet life's daily needs. For these fishermen, their catch not only feeds their families and villages, but also pays for healthcare and education costs.

80. The oceans surrounding American Samoa also support rare and diverse marine species which hold important cultural, spiritual, and scientific value. These species include a rich mosaic of shallow and mesophotic coral reefs, sponges, crabs, deep-sea cucumbers, sea turtles, marine mammals, hundreds of coral and fish species, and a variety of migratory species.

81. Many of the species found in American Samoa's waters are listed as endangered or threatened under the ESA. The endangered blue whale, fin whale, sei whale, and sperm whale are found in waters around American Samoa. All five sea turtle populations found in American Samoa's waters are listed as endangered or threatened: the green sea turtle (Central South Pacific Distinct Population

Segment (DPS)),[3] hawksbill sea turtle, loggerhead sea turtle (South Pacific DPS), and leatherback sea turtle are listed as endangered, while the olive ridley sea turtle is listed as threatened. The oceanic whitetip shark, giant manta ray, scalloped hammerhead shark (Indo-West Pacific DPS), and chambered nautilus are also found in American Samoa's waters and are listed as threatened. Five coral species in American Samoa's waters (*Acropora globiceps*, *A. retusa*, *A. speciosa*, *Fimbriaphyllia paradivisa*, and *Isopora crateriformis*) are listed as threatened. Additionally, American Samoa hosts critical habitats for all five coral species.

82. In recognition of this tremendous biodiversity, the United States established the National Marine Sanctuary of American Samoa and the Rose Atoll Marine National Monument in the waters directly abutting the areas that MMA now seeks to lease. The International Union for Conservation of Nature's Marine Mammal Protected Areas Task Force has also recognized the productive shelf and slope waters of the Samoan Archipelago, including Muliava, by formally identifying the area as an Important Marine Mammal Area for thirteen marine mammal species.

---

[3] The ESA allows NMFS to separately list individual DPSs of species as threatened or endangered. *See* 16 U.S.C. § 1532(16) (defining "species" to include "any distinct population segment of any species of vertebrate fish or wildlife which interbreeds when mature"). NMFS identifies DPSs based on the population's "discreteness," "significance," and "conservation status." 61 Fed. Reg. 4722, 4725 (Feb. 7, 1996).

83. The Samoan Basin has been historically under-surveyed, however. For example, as of August 2025, there were no publicly available data on demersal fish, benthic invertebrates, or mesopelagic animal communities.

## II. DEEP-SEA MINING ACTIVITIES WILL HARM AMERICAN SAMOA'S MARINE ECOSYSTEMS.

84. Several areas of the deep seabed around the world—including around American Samoa—contain polymetallic nodules, potato-shaped balls of minerals that formed over millions of years as minerals accrete from seawater. These nodules contain minerals like nickel, cobalt, and manganese, which can be used to construct electronics, batteries, and other products. Accordingly, companies have expressed interest in mining the nodules from the seabed for profit.

85. To date, there has not been a commercial seabed mining operation established anywhere in the world. Mining the deep sea is technologically and financially difficult. Equipment must operate at depths of thousands to tens of thousands of feet where water pressure is immense.

86. There has been a limited amount of seabed mining exploration and testing activity in international waters and in other countries. Those tests have demonstrated that commercial mining, and even the initial exploration activities, will have significant adverse effects on the marine environment.

87. Mining activities—whether at the testing phase or extraction phase—involve scouring the seabed to extract nodules. Mining equipment stirs up toxic sediment and kills the biota in its path. Mining disturbance studies have found that impacts to the ecosystem persist for at least 44 years, with estimates that ecosystem recovery will take over 100 years. Scientists estimate that sediment plumes from mining can extend for up to 100 kilometers (over 60 miles) from the mining site, smothering corals and other habitats even far distant from the mining site. Such plumes harm not only the corals themselves, but also the sea turtles, sharks, rays, fish, and other species that depend on coral reef ecosystems.

88. Nodules and the sediment collected with them are transported to a vessel on the surface, which separates the nodules from the sediment. That sediment waste is then discharged higher in the water column. The sediment waste can block light from reaching phytoplankton, altering the food web. The waste also contains toxic metals such as copper, cadmium, zinc, and lead, as well as rare earth elements, that can enter the food chain and bioaccumulate in species like giant manta rays, whales, tuna, and other pelagic species.

89. Exploration for seabed minerals uses a variety of technologies to map and sample the seafloor, including hull-mounted multibeam echosounders, dynamic positioning vessels, autonomous underwater vehicles, remotely operated vehicles, and other autonomous or robotic equipment. The noise from these

activities can damage hearing and interfere with essential behaviors in marine mammals and other animals.

90. There are also numerous ways that the vessels used for surveying and mining can harm marine species, including injury or death from ship strikes, masking of communication, and behavioral disturbance from noise, and air and water pollution. Vessel impacts can occur not only where exploration or development activities are taking place, but also while vessels are traveling to or from the project location and when mined nodules are transshipped, potentially to distant ports.

91. For example, the issuance of seabed mining leases offshore of American Samoa can increase vessel traffic to and from Hawai‘i's ports and through Hawai‘i's waters from the ships conducting activities on those leases. That vessel traffic can harm wildlife and habitat in Hawai‘i's waters.

## III. MMA PLANS TO HOLD THE FIRST EVER DEEP-SEA MINING LEASE SALE OFF AMERICAN SAMOA.

92. MMA has never before sold mineral leases off American Samoa.

93. On June 16, 2025, MMA published a "Request for information and interest" (RFI) for a potential mineral lease sale in an area offshore of American Samoa. 90 Fed. Reg. 25369 (June 16, 2025). MMA described the "RFI Area" as 18.1 million acres "located near the eastern limit of the American Samoa [outer

continental shelf] bordering the Cook Islands Exclusive Economic Zone, northeast of the Manu'a [*sic*] Islands and Rose Atoll (roughly 70 nautical miles northeast of Rose Atoll)." *Id.* at 25371.

94. On November 10, 2025, after receiving over 76,000 comments in response to the RFI—the overwhelming majority of which explained why MMA should not proceed with leasing—MMA announced an "Area ID" that nearly doubled the size of the proposed area for leasing to over 33 million acres.

95. MMA's proposal has received widespread opposition from multiple branches of the American Samoa government, village councils, churches, and communities.

96. On July 17, 2026, MMA published a notice of availability in the Federal Register of the Proposed Leasing Notice for American Samoa Outer Continental Shelf (OCS) Pacific Mineral Lease Sale 1 (PACM-1). 91 Fed. Reg. 44870 (July 17, 2026).

97. On October 19, 2026, MMA published on its website a Final Leasing Notice to hold American Samoa Outer Continental Shelf (OCS) Pacific Mineral Lease Sale 1 (PACM-1) on November 19, 2026. MMA will offer for sale two leases encompassing almost all the area described in the Area ID, over 31 million acres total. *See* Figure 1.

**Figure 1: American Samoa OCS Mineral Lease Sale Areas Final Leasing Notice**




98. The Decision Memorandum for the Final Leasing Notice states that leases "will grant rights to develop these deposit types [polymetallic nodules and ferromanganese crust deposits] and minerals produced incidental to and in direct association with production from these deposits."

99. The primary lease term will be 20 years, although the term can be extended if a lease enters production. The leases include stipulations governing exploration, testing, survey, and mining activities.

100. MMA claims it was granted authority to sell leases for mineral development in American Samoa by the Inflation Reduction Act of 2022 (Pub. L. No. 117-169). There is no evidence that MMA assessed how the Instruments of Cession or the 1929 Ratification Act affect MMA's authority.

A. NEPA Analysis

101. On July 16, 2026, MMA published an Environmental Assessment (EA) under NEPA for the American Samoa lease sale.

102. The EA states the purpose of the proposed action is "to issue up to two leases for marine minerals in the American Samoa OCS." It further states that the "the need is for [MMA] to issue OCS leases to provide access to marine minerals that could potentially be an important and underutilized domestic source." It states leases would "help meet U.S. demand" for minerals and "could support national security and economic resilience."

103. Despite MMA's stated need and objectives for the lease sale, its EA does not include the intended mineral exploration, testing, development, and mining as effects of the proposed action or in its discussion of alternatives. Rather, the EA evaluates only the effects of "preliminary activities" on leases and concludes they will be insignificant.

104. MMA evaluated three alternatives in its EA: 1) the proposed action of leasing 134,000 $km^2$ divided into two lease blocks; 2) a "maximum leasing"

alternative of leasing 134,000 $km^2$ divided into five lease blocks, and 3) a "no action alternative" in which no leases would be sold.

105. MMA declined to consider several alternatives proposed in public comments, including a buffer around Rose Atoll Marine National Monument and Rose Atoll National Wildlife Refuge, and other spatial exclusions. MMA dismissed the Rose Atoll buffer alternative because MMA asserted "the lease activities are expected to have minimal impact." MMA dismissed spatial exclusions because it asserted they "would not provide meaningful environmental advantages."

106. On October 14, 2026, MMA signed a Finding of No Significant Impact under NEPA determining that the proposed action of issuing up to two commercial leases for marine minerals in the American Samoa OCS will not significantly affect the quality of the human environment.

B. ESA Consultation

107. In advance of publishing its proposed leasing notice, MMA completed expedited informal consultation with NMFS under the ESA on the American Samoa lease sale.

108. On or about January 16, 2026, MMA sought NMFS's concurrence that the proposed action "may affect, but is not likely to adversely affect" any

species listed as threatened or endangered or any critical habitat designated under the ESA, avoiding the need to engage in formal consultation under ESA section 7.

109. On or about February 3, 2026, MMA submitted an updated biological assessment to NMFS on its proposed action.

110. In its updated biological assessment, MMA determined that the "action area" (*i.e.*, the "areas to be affected directly or indirectly by the Federal action," 50 C.F.R. § 402.02) for the planned lease sales "encompasses a big area which includes waters nearby American Samoa where most of the Proposed Action will take place as well as waters near Hawaii and the West Coast where vessels may start their transit(s)." *See* Biological Assessment, Figure 1.




**Figure 1. Map of the Proposed Action, which includes the American Samoa OCS, Hawaiian waters, and the U.S. West Coast**

111. MMA's biological assessment states that the "need" for the lease sale is "to provide access to marine minerals that could potentially be an important and underutilized domestic source." The lease sale "aims to facilitate the potential development" of those minerals. MMA states its proposed "seabed leasing aligns with ensuring secure and sustainable domestic supply of strategic minerals."

112. Despite MMA's stated purpose for the lease sale, its biological assessment does not include in the "Effects of the Action" the intended mineral exploration, development, and mining. Rather, the biological assessment evaluates only the effects of "preliminary activities" on the leases and concludes they will be insignificant.

113. The biological assessment indicates that preliminary activities will entail the use of High-Resolution Geophysical (HRG) surveys (including multibeam echosounders, side-scan sonar, and sub-bottom profilers), seabed sampling by remotely operated vehicles, anchors on the seafloor for buoys and data collection instruments, and seabed box core sampling, among other actions.

114. The biological assessment identifies several potential impacts of preliminary activities to ESA-listed marine mammals and sea turtles, including 1) noise from HRG surveys, geotechnical surveys, aircrafts, and vessels; 2) potential collisions with project-related vessels; 3) potential entanglement in mooring systems associated with the installation of buoys and with the deep-tow survey

systems; 4) disturbance to feeding or modified prey abundance; 5) habitat disturbance; and 6) accidental release of pollutants and marine debris. While the biological assessment states the impacts are anticipated to be "insignificant," it indicates that MMA could not estimate the extent of many impacts.

115. The biological assessment states that the effects of preliminary activities on ESA-listed sharks and rays include habitat disturbance, sediment resuspension (from sampling), fish aggregating device effects of buoys and mooring lines, entanglement, noise from surveys and vessels, artificial light, electromagnetic field alteration, ship strikes, and pollution from oil spills and marine debris. The biological assessment concludes that the action is not likely to adversely affect listed fishes.

116. The biological assessment concludes that effects to ESA-listed corals and other invertebrates will be "insignificant" because the species "are primarily associated with benthic habitats that do not overlap with the proposed lease areas." However, that conclusion is inconsistent with the biological assessment's inclusion of all five coral species' critical habitats in the "action area," which is defined as "all areas to be affected directly or indirectly by the federal action."

117. Finally, the biological assessment asserts effects to designated critical habitat for several species will be either "discountable" or "short term and

temporary," so concludes the action is not likely to adversely affected any designated critical habitat.

118. On February 13, 2026, NMFS issued a four-page letter concurring in MMA's assessment that its "proposed action to issue up to two leases for the purpose of commercial mining and authorize early-stage data collection … may affect, but is not likely to adversely affect" approximately 60 ESA-listed species, including: endangered blue whales, fin whales, sei whales, and sperm whales, five listed sea turtle populations, five threatened coral species, and threatened oceanic whitetip sharks, giant manta rays, scalloped hammerhead sharks, and chambered nautilus, all of which are found in American Samoa waters. The list of species that NMFS concluded MMA's planned leasing action "may affect" also includes several imperiled species that are endemic to Hawai'i, including the critically endangered Main Hawaiian Island insular false killer whale and Hawaiian monk seal. NMFS's Letter of Concurrence states that it "concludes informal consultation under section 7 of the ESA" for the action.

119. Like MMA's biological assessment, NMFS's Letter of Concurrence does not contain any analysis of the effects of exploration, testing, development, or production on the leases, even though the stated intent of MMA's lease sale is to cause seabed mineral exploration, testing, development, and production in the areas offered for lease. Those post-lease activities are likely to harm ESA-listed

marine mammals, sea turtles, sharks, manta rays, and corals, as well as critical habitat for corals, in the numerous ways discussed above.

120. For the only stressor NMFS did purport to evaluate—HRG surveys—NMFS concluded that no adverse effects would occur from that equipment based on its assumption that MMA "is implementing the criteria that equipment meet certain source levels, transmission frequencies, directionalities, beamwidths, tow depths, and pulse repetition rates to avoid potential adverse effects to the ESA-listed species under consideration." The Letter of Concurrence does not identify any binding way in which MMA is implementing those criteria. And there is nothing in MMA's biological assessment, Final Leasing Notice, lease stipulations, or information to lessees that would impose such criteria.

121. On August 18, 2026, Plaintiffs FAS and CCH filed a challenge to the Letter of Concurrence in this Court. *Fa'asao Amerika Samoa, et al. v. NMFS, et al.*, Civ. No. 26-00438-JAO-KJM (filed August 18, 2026). A hearing on the plaintiffs' motion for summary judgment in that case is scheduled for October 30, 2026.

## CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION – MMA's Final Leasing Notice Is in Excess of MMA's Authority Under the Instruments of Cession and the 1929 Ratification Act, in Violation of the APA, the Instruments of Cession, and the 1929 Ratification Act.

122. Plaintiffs reallege and incorporate by this reference the preceding paragraphs of this Complaint.

123. The Final Leasing Notice and Finding of No Significant Impact are final agency actions as defined by the APA, for which there is no other adequate remedy in a court.

124. The Instruments of Cession ceded the lands and waters that make up American Samoa in exchange for promises that the United States would pay fair consideration for the use of land or any other thing in American Samoa, preserve the property of the inhabitants of American Samoa, and protect the traditional rights of individuals and *matai* to their property. *See* 1900 Treaty; 1904 Treaty.

125. Congress ratified the Instruments of Cession in 1929 and affirmed these conditions as supreme law of the United States. When ratifying the Instruments of Cession, Congress enacted statutory requirements for the disposition of ceded lands, waters, and property. Specifically, the 1929 Ratification Act stipulates that the United States' public land laws do not authorize or regulate the disposal or management of public lands in American Samoa. 48 U.S.C. § 1661(b). Instead, Congress must pass special laws to manage and dispose of public lands in American Samoa. *Id.* Such special laws must ensure that all revenue and proceeds from the management and disposition of Samoan public lands shall be used solely for the benefit of the inhabitants of American Samoa. *Id.*

126. By executing the Instruments of Cession and ratifying the treaties through the 1929 Ratification Act, the United States codified these obligations into federal law and took on a trust responsibility to the village governments and its inhabitants to manage the ceded lands and waters that make up American Samoa in line with the obligations imposed by the Instruments of Cession and the 1929 Ratification Act.

127. The entirety of the submerged public lands that MMA is offering for lease was ceded by the Instruments of Cession. These lands are therefore subject to the Instruments of Cession and the 1929 Ratification Act.

128. The United States Government has not paid any consideration, let alone "fair consideration," for the submerged public lands surrounding American Samoa. *See* 1900 Treaty. Neither has the United States Government, through the Secretary of the Interior or MMA, preserved the rights of the people of American Samoa in the lease sale terms set forth in the Final Leasing Notice. *See id.*; 1904 Treaty.

129. Additionally, Congress has never passed a "special law" authorizing mineral leasing of submerged public lands surrounding American Samoa. *See* 48 U.S.C. § 1661(b). OCSLA is not a "special law[] for the[] management and disposition" of American Samoa lands. *Id.* Nor does OCSLA direct "all revenue from or proceeds of" leasing to "be used solely for the benefit of the inhabitants

of" American Samoa. *See id.* Therefore, OCSLA does not provide MMA with authority to dispose of submerged public lands surrounding American Samoa.

130. For the foregoing reasons, MMA's issuance of the Final Leasing Notice is in excess of MMA's statutory jurisdiction, authority, and limitations and is arbitrary, capricious, an abuse of discretion, and not in accordance with the Instruments of Cession or the 1929 Ratification Act, in violation of the APA. 5 U.S.C. § 706(2).

**SECOND CAUSE OF ACTION – MMA's Final Leasing Notice Is in Excess of MMA's Authority Under OCSLA, in Violation of the APA and OCSLA.**

131. Plaintiffs reallege and incorporate by this reference the preceding paragraphs of this Complaint.

132. MMA identifies the 2022 Offshore Wind Amendment to OCSLA as the source of its authority to conduct mineral lease sales on American Samoa's outer continental shelf.

133. Prior to the Offshore Wind Amendment, OCLSA limited MMA's authority to lease for renewable energy, oil and gas, or mineral development to only the outer continental shelves of states, not territories. The Offshore Wind Amendment expressly specified only that MMA may sell leases for renewable energy development offshore of the territories. *Inflation Reduction Act of 2022*, Pub. L. No. 117-169, 136 Stat. 2054–55. Congress did not, with the Offshore

Wind Amendment, clearly grant MMA new authority to sell mineral rights offshore of any territory.

134. Congress did not explicitly or implicitly amend 43 U.S.C. § 1337(k) to grant MMA broad mineral leasing authority on submerged lands surrounding American Samoa.

135. MMA's issuance of the Final Leasing Notice, therefore, is in excess of MMA's statutory jurisdiction, authority, and limitations and is arbitrary, capricious, an abuse of discretion, and not in accordance with OCSLA, in violation of the APA. 5 U.S.C. § 706(2).

**THIRD CAUSE OF ACTION – MMA's Final Leasing Notice Is Contrary to MMA's Regulations, in Violation of the APA, OCSLA, and MMA's Regulations.**

136. Plaintiffs reallege and incorporate by this reference the preceding paragraphs of this Complaint.

137. OCSLA requires that a final leasing notice be "in accordance with rules and regulations promulgated by the Secretary." 43 U.S.C. § 1337(*l*). It also requires that the issuance of any lease "be conditioned upon compliance with regulations issued under" OCLSA. *Id.* § 1334(b).

138. Part 581 of MMA's regulations "establish[es] procedures under which the Secretary of the Interior (Secretary) will exercise the authority granted to administer a leasing program for minerals other than oil, gas, and sulphur in the

OCS." 30 C.F.R. § 581.1; *see also id.* § 581.2. These regulations "apply exclusively to leasing activities for minerals other than oil, gas, and sulphur in the OCS pursuant to" OCSLA. *Id.* § 581.1.

139. The regulations define "Outer Continental Shelf" or OCS to mean "all submerged lands lying seaward and outside of the area of lands beneath navigable waters as defined in section 2 of the Submerged Lands Act (43 U.S.C. 1301) and of which the subsoil and seabed appertain to the United States and are subject to its jurisdiction and control." *Id.* § 581.3. Section 2 of the Submerged Lands Act defines "lands beneath navigable waters" with reference to waters seaward of each "State," where "State" means only the "State[s] of the Union." 43 U.S.C. § 1301(a)(2), (g). Therefore, the definition of Outer Continental Shelf or OCS in MMA's mineral leasing regulations includes only submerged lands seaward of the navigable waters of states; it does not include submerged lands seaward of the navigable waters of territories.

140. MMA's mineral leasing regulations thus do not provide for leasing of mineral rights on submerged lands surrounding American Samoa.

141. MMA's Final Leasing Notice to lease mineral rights on submerged lands surrounding American Samoa is not in accordance with or in compliance with the regulations promulgated by the Secretary under OCSLA. *See* 43 U.S.C. §§ 1334(b), 1337(*l*).

142. For the foregoing reasons, MMA's Final Leasing Notice is in excess of MMA's statutory jurisdiction, authority, and limitations and is arbitrary, capricious, an abuse of discretion, and not in accordance with 30 C.F.R. part 581 or with OCSLA, in violation of the APA and OCSLA. 5 U.S.C. § 706(2).

**FOURTH CAUSE OF ACTION – MMA Failed to Evaluate All Effects of the Action, in Violation of NEPA, OCLSA, and the APA.**

143. Plaintiffs reallege and incorporate by reference the preceding paragraphs of this Complaint.

144. NEPA requires federal agencies to prepare an EIS for all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). Further, OCLSA requires preparation of a full environmental impact statement at the lease sale stage. 43 U.S.C. § 1346(a)(1).

145. NEPA requires MMA to assess all environmental effects of the proposed action and connected actions. 42 U.S.C. § 4332(2)(C).

146. Exploration, testing, survey, and mining activities on leases are reasonably foreseeable and have a reasonably close causal relationship to the sale of such leases in Mineral Lease Sale PACM-1. Alternatively, MMA's permitting of exploration, testing, survey, and mining activities on leases are connected actions to Mineral Lease Sale PACM-1 because they mutually depend on each other for their justification. *See, e.g.*, *NEPA Handbook* at 4, 23.

147. MMA did not include the effects of exploration, testing, survey, or mining activities in its NEPA analysis.

148. An OCSLA mineral lease sale has a reasonably foreseeable significant effect on the quality of the human environment. *See* 42 U.S.C. §§ 4332(2)(C), 4336(b)(1).

149. MMA did not prepare an EIS for Mineral Lease Sale PACM-1.

150. For the foregoing reasons, MMA acted in a manner that is arbitrary and capricious, an abuse of discretion, and not in accordance with NEPA, in violation of the APA. 5 U.S.C. § 706(2).

**FIFTH CAUSE OF ACTION – MMA Failed to Consider a Reasonable Range of Alternatives, in Violation of NEPA and the APA.**

151. Plaintiffs reallege and incorporate by reference the preceding paragraphs of this Complaint.

152. NEPA requires MMA to consider a reasonable range of alternatives to its proposed action that meet the purpose and need of the proposal. 42 U.S.C. § 4332(2)(C)(iii), (H).

153. An agency may not define the purpose and need in unreasonably narrow terms that preordain its choice of alternatives.

154. MMA's definition of the purpose of its proposal as "to issue up to two commercial leases for marine minerals in the American Samoa OCS" with specific

reference to its preferred alternative is unreasonably narrow and, therefore, is arbitrary and capricious and contrary to NEPA.

155. The only alternatives that MMA considered were to lease either 100% of the proposed lease area or 0% of the proposed lease area. MMA's failure to consider any reasonable alternative that meaningfully limited the leasing area is arbitrary and capricious and contrary to NEPA.

156. MMA declined to consider alternatives put forth by commenters to use "other leasing configurations" such as "spatial exclusions" on the basis that "they do not meet the purpose and need as effectively as preliminary activities that may be authorized under the Proposed Action," and they "would not provide meaningful environmental advantages compared to the alternatives already under consideration given the early-stage and novel nature of this Proposed Action." MMA also declined to consider a suggested alternative that would impose a twenty-five or fifty nautical mile buffer from the Rose Atoll Marine National Monument and the Rose Atoll National Wildlife Refuge.

157. MMA did not explain why the suggested alternatives would not meet the purpose and need. MMA's rationale for dismissing an alternative with a buffer for Rose Atoll—that lease activities allegedly would have minimal impacts—irrationally ignores the effects of post-leasing exploration, development, testing, and mining and that sediment plumes can be transported beyond the lease area to

Rose Atoll. MMA's statement that the suggested alternative spatial configurations would not provide meaningful environmental advantages is contrary to its findings elsewhere in the EA that excluding sensitive habitats would minimize environmental risks. MMA's rejection of the suggested alternatives from further consideration is arbitrary and capricious and contrary to NEPA.

158. For the foregoing reasons, MMA's alternatives analysis is arbitrary, capricious, an abuse of discretion, and not in accordance with NEPA, in violation of the APA. 5 U.S.C. § 706(2).

**SIXTH CAUSE OF ACTION – MMA Has Failed to Ensure Its Action Is Not Likely to Jeopardize Any ESA-Listed Species or Result in the Destruction or Adverse Modification of Any Critical Habitat, in Violation of the ESA.**

159. Plaintiffs reallege and incorporate by this reference the preceding paragraphs of this Complaint.

160. Section 7(a)(2) of the ESA requires each federal agency, in consultation and with the assistance of the relevant wildlife agency, to "insure that any action authorized, funded, or carried out by such agency … is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of [critical] habitat of such species." 16 U.S.C. § 1536(a)(2). Such consultations must use the best available scientific information. *Id.*

161. MMA's Final Leasing Notice is a federal agency "action" under the ESA. 50 C.F.R. §§ 402.02, 402.03.

162. Mineral Lease Sale PACM-1 may affect approximately 60 ESA-listed species, identified in MMA's biological assessment. Accordingly, prior to conducting the American Samoa lease sale, MMA is required to complete Section 7 consultation with NMFS and obtain NMFS's written statement detailing its conclusions on the effects of Mineral Lease Sale PACM-1. 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14(a).

163. In an informal consultation, NMFS, as the consulting wildlife agency, must review all relevant information and make a reasonable, factually supported decision as to whether to concur in the action agency's determination that the action is not likely to adversely affect any listed species or critical habitat. 50 C.F.R. §§ 402.12(j)–(k), 402.13; *see ESA Handbook* 3-6 ("All decisions reached during the [informal] consultation process must be based on sound science."). If NMFS "do[es] not agree with the action agency's determination of effects or if there is not enough information to adequately determine the nature of the effects," it may not issue a letter of concurrence. *ESA Handbook* 3-13.

164. NMFS was required to consider and analyze all effects of the entire agency action in determining whether to concur in MMA's not likely to adversely affect determination. 50 C.F.R. §§ 402.12(a), 402.13; *ESA Handbook* 3-6 (stating

concurrence must be "based on review of all potential effects, direct and indirect"). When a federal agency sells leases for resource extraction, the entire agency action includes not just leasing, but also post-leasing exploration, development, and production from the leases. Accordingly, the entire agency action under consultation here includes leasing, exploration, testing, survey, and mining activities.

165. Even if exploration, testing, survey, and mining activities were not part of the agency action, their effects are nonetheless "indirect effects" of leasing because exploration, testing, survey, and mining activities "are caused by the proposed action." 50 C.F.R. § 402.02. Alternatively, exploration, testing, survey, and mining activities are "interrelated or interdependent with [MMA's leasing] action." *Id.*

166. NMFS did not include the effects of post-leasing exploration, testing, survey, or mining activities in reaching its conclusion that the action is not likely to adversely affect any species or critical habitat. Therefore, NMFS's Letter of Concurrence is arbitrary and capricious and contrary to the ESA and its implementing regulations.

167. In evaluating the effects of preliminary activities on leases, the Letter of Concurrence evaluates only impacts from HRG surveys. NMFS's conclusion that impacts from HRG surveys during preliminary activities would not cause

adverse effects on species or critical habitat is premised on the assumption that MMA will implement requirements to limit sound from survey equipment. There is, however, no evidence that MMA has committed to implementing HRG limits through binding measures. The Letter of Concurrence contains no evidence that NMFS considered whether MMA can or will do so. NMFS's reliance on HRG limits to reach its concurrence decision is arbitrary and capricious and contrary to the ESA and its implementing regulations.

168. Because the Letter of Concurrence is unlawful, it does not satisfy MMA's duty to complete consultation under Section 7.

169. To the extent that MMA claims to have engaged in incremental step consultation pursuant to 50 C.F.R. § 402.14(k), that regulation requires NMFS to "issue a biological opinion on the incremental step being considered, including its views on the entire action." Among other things, the regulation requires NMFS to determine whether "[t]here is a reasonable likelihood that the entire action will not violate section 7(a)(2) of the Act." *Id.* § 402.14(k)(5). NMFS did not issue a biological opinion for Mineral Lease Sale PACM-1 and did not express any views on whether the entire action, including post-leasing exploration, testing, development, and mining activities, would likely violate ESA section 7(a)(2).

170. MMA has not completed the required consultation and has failed to ensure that Mineral Lease Sale PACM-1 is not likely to jeopardize the continued

existence of any ESA-listed species or destroy or adversely modify any critical habitat, in violation of the ESA and its implementing regulations. 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14.

**SEVENTH CAUSE OF ACTION – MMA Failed to Conduct Required Environmental Studies Prior to Leasing, in Violation of OCLSA and the APA.**

171. Plaintiffs reallege and incorporate by reference the preceding paragraphs of this Complaint.

172. Before MMA may hold a lease sale, OCSLA requires the agency to conduct environmental studies sufficient to "establish information needed for assessment and management of environmental impacts on the human, marine, and coastal environments of the outer Continental Shelf and the coastal areas which may be affected by … mineral development." 43 U.S.C. § 1346(a)(1); *accord* 30 C.F.R. § 556.1300.

173. Such studies must include, "to the extent practicable, analyses of the impacts of pollutants introduced into the environments and impacts of offshore activities on the seabed and affected coastal areas." 30 C.F.R. § 556.1300(a); *see also* 43 U.S.C. § 1346(a)(3).

174. MMA must commence such studies no later than six months prior to holding a lease sale. 43 U.S.C. § 1346(a)(2); 30 C.F.R. § 556.1300(c).

175. MMA is permitted to issue mineral leases only in accordance with the provisions of OCSLA and its implementing regulations. 43 U.S.C. §§

1333(a)(1)(B), 1337(*l*). Accordingly, MMA is permitted to issue leases only if it has complied with the environmental study requirements for the lease sale.

176. At a minimum, "information needed for assessment and management of environmental impacts" of "mineral development" includes 1) sufficient baseline data on the affected human, marine, and coastal environments and 2) sufficient information on how mineral development may affect those environments. *See* 43 U.S.C. § 1346(a)(1).

177. On information and belief, prior to May 19, 2026—six months before the lease sale date—MMA did not commence any studies needed to assess the environmental impacts of "mineral development," pollutants, or other "offshore activities." *See id.* § 1346(a)(1), (3); 30 C.F.R. § 556.1300(a).

178. Insofar as MMA may have commenced any studies prior to May 19, 2026, there is no evidence that they are sufficient to "establish information needed for assessment and management of environmental impacts" from mineral development. *See* 43 U.S.C. § 1346(a)(1). In addition, there is no evidence that MMA completed any studies to provide it with the information needed to assess and manage environmental impacts for its final leasing decision.

179. Insofar as MMA claims its EA for the lease sale constitutes the environmental study required by OCSLA, the EA does not meet the requirements of 43 U.S.C. § 1346(a) or 30 C.F.R. § 556.1300 because its limited assessment of

only preliminary activities fails to establish information needed to assess and manage the environmental impacts of mineral development—including post-leasing exploration, testing, and mining—or pollution or other effects from offshore activities on the leases. MMA's limited EA is not the full environmental impact statement that section 1346 requires.

180. For the foregoing reasons, MMA's Final Leasing Notice is arbitrary, capricious, an abuse of discretion, and not in accordance with OCSLA or its implementing regulations, in violation of the APA. 5 U.S.C. § 706(2).

PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court:

1. Enter a declaratory judgment that MMA's Final Leasing Notice violates the Instruments of Cession, the 1929 Ratification Act, OCSLA, NEPA, the ESA, and the APA;

2. Hold unlawful and set aside MMA's Final Leasing Notice;

3. Issue appropriate injunctive relief;

4. Maintain jurisdiction over this action until MMA complies with the Instruments of Cession, the 1929 Ratification Act, OCSLA, NEPA, the ESA, the APA, and every order of this Court;

5. Award Plaintiffs the costs of this litigation, including reasonable attorney fees; and

6. Provide such other relief as may be just and proper.

DATED: October 26, 2026.

Respectfully submitted,

DAVID L. HENKIN
HARLEY M. BROYLES
EARTHJUSTICE
850 Richards Street, Suite 400
Honolulu, Hawai‘i 96813
T: (808) 599-2436
Email: dhenkin@earthjustice.org
hbroyles@earthjustice.org

/s/ Christopher D. Eaton
CHRISTOPHER D. EATON
(*pro hac vice*)
EARTHJUSTICE
810 3rd Avenue, Suite 610
Seattle, Washington 98104
T: (206) 343-7340
Email: ceaton@earthjustice.org

JOSEPH V. LANGKILDE III
(*pro hac vice*)
EARTHJUSTICE
1250 I Street NW, Fourth Floor
Washington, DC 20005
T: (202) 667-4500
Email: jlangkilde@earthjustice.org

Attorneys for Plaintiffs
Faleula o le Manu‘atele, Fa‘asao Amerika Samoa, and Conservation Council for Hawai‘i