DAVID L. HENKIN #6876
HARLEY M. BROYLES #11640
EARTHJUSTICE
850 Richards Street, Suite 400
Honolulu, Hawaiʻi 96813
T: (808) 599-2436
Email: dhenkin@earthjustice.org
hbroyles@earthjustice.org

CHRISTOPHER D. EATON
(*pro hac vice*)
EARTHJUSTICE
810 3rd Avenue, Suite 610
Seattle, Washington 98104
T: (206) 343-7340
Email: ceaton@earthjustice.org

JOSEPH V. LANGKILDE III
(*pro hac vice*)
EARTHJUSTICE
1250 I Street NW, Fourth Floor
Washington, DC 20005
T: (202) 667-4500
Email: jlangkilde@earthjustice.org

Attorneys for Plaintiffs

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF HAWAIʻI

| | |
|---|---|
| FALEULA O LE MANUʻATELE, FAʻASAO AMERIKA SAMOA, and CONSERVATION COUNCIL FOR HAWAIʻI,<br><br>Plaintiffs,<br><br>v.<br><br>MARINE MINERALS ADMINISTRATION and DOUG BURGUM in his official capacity as Secretary of the Department of Interior,<br><br>Defendants. | CIVIL NO. CV-26-543 JAO-KJM<br><br>PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT RE: SIXTH CLAIM FOR RELIEF<br><br>Judge: Hon. Jill A. Otake<br><br>Trial Date: None Set |

# TABLE OF CONTENTS


I. INTRODUCTION .......... 1

II. STATUTORY FRAMEWORK .......... 2

- A. Endangered Species Act .......... 2
- B. Outer Continental Shelf Lands Act .......... 5

III. FACTUAL BACKGROUND .......... 6

- A. Seabed Mineral Exploration and Extraction Activities Will Harm Imperiled Wildlife. .......... 6
- B. NMFS Concludes Seabed Mining Leasing off American Samoa Will Not Adversely Affect ESA-Listed Species or Critical Habitat. .......... 8
- C. MMA Issues a Final Leasing Notice for the American Samoa Lease Sale in Reliance Upon NMFS's LOC. .......... 11

IV. PROCEDURAL HISTORY .......... 11

V. STANDARD OF REVIEW .......... 13

VI. ARGUMENT .......... 14

- A. MMA Violated the ESA by Relying on an Unlawful LOC. .......... 15
- B. Even if the Court Does Not Find the LOC Unlawful, MMA Violated the ESA by Unlawfully Limiting the Scope of its Action. .......... 19
- C. The Court Should Vacate the Final Leasing Notice. .......... 22

VII. CONCLUSION .......... 25

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Conner v. Burford*,
848 F.2d 1441 (9th Cir. 1988) ....................*passim*

*Ctr. for Biological Diversity v. Bernhardt*,
982 F.3d 723 (9th Cir. 2020) ....................18, 19, 22

*Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.* (*BLM I*),
698 F.3d 1101 (9th Cir. 2012) ....................*passim*

*Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.* (*BLM II*),
No. CV-24-00141-TUC-RM, 2026 WL 878924 (D. Ariz. Mar. 31, 2026) ....................14, 15, 16

*Ctr. for Biological Diversity v. U.S. Dep't of Interior*,
563 F.3d 466 (D.C. Cir. 2009) ....................14

*Ctr. for Biological Diversity v. U.S. Dep't of the Interior*,
837 F. Supp. 3d 1080 (N.D. Cal. 2026) ....................3

*Friends of the Earth v. Haaland*,
583 F. Supp. 3d 113 (D.D.C. 2022) ....................24

*Gulf Restoration Network v. Haaland*,
47 F.4th 795 (D.C. Cir. 2022) ....................24

*Hawaii Longline Ass'n v. NMFS*,
281 F. Supp. 2d 1 (D.D.C. 2003) ....................16

*King v. Cnty. of Los Angeles*,
885 F.3d 548 (9th Cir. 2018) ....................7, 11

*Mont. Wildlife Fed'n v. Haaland*,
127 F.4th 1 (9th Cir. 2025) ....................22, 23

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins.*,
463 U.S. 29 (1983) ....................13

**Page(s)**

**CASES (Continued)**

*N. Slope Borough v. Andrus*,
642 F.2d 589 (D.C. Cir. 1980) .......... 20

*Nat'l Parks Conservation Ass'n v. Semonite*,
422 F. Supp. 3d 92 (D.D.C. 2019) .......... 25

*Nw. Coal. for Alts. to Pesticides v. U.S. EPA*,
544 F.3d 1043 (9th Cir. 2008) .......... 13

*Pac. Rivers Council v. Thomas*,
30 F.3d 1050 (9th Cir. 1994) .......... 21

*Res. Ltd., Inc. v. Robertson*,
35 F.3d 1300 (9th Cir. 1993) .......... 20, 22

*Sec'y of the Interior v. California*,
464 U.S. 312 (1984) .......... 14

*Tenn. Valley Auth. v. Hill*,
437 U.S. 153 (1978) .......... 2

*Thomas v. Peterson*,
753 F.2d 754 (9th Cir. 1985) .......... 14

*Wild Fish Conservancy v. Salazar*,
628 F.3d 513 (9th Cir. 2010) .......... 1, 16, 17, 18

**UNITED STATES CODE**

5 U.S.C. § 706(2)(A) .......... 13

16 U.S.C. § 1532(16) .......... 7

16 U.S.C. § 1533(a) .......... 2

16 U.S.C. § 1536(a)(2) .......... 2, 3, 20

16 U.S.C. § 1536(b)(3)(A) .......... 4

16 U.S.C. § 1536(c)(1) .......... 3

**Page(s)**

**UNITED STATES CODE (Continued)**

43 U.S.C. § 1301(a)(2) .....5

43 U.S.C. § 1331(c) .....5

43 U.S.C. § 1331 *et seq.* .....5

43 U.S.C. § 1337(k) .....5

**CODE OF FEDERAL REGULATIONS**

30 C.F.R. § 581 *et seq.* .....5

30 C.F.R. § 581.19 .....6

30 C.F.R. § 582.3 .....6

30 C.F.R. § 582.21 .....19

30 C.F.R. § 582.21(a) .....6

30 C.F.R. § 582.21(d) .....5

30 C.F.R. § 582.22 .....6

30 C.F.R. § 582.23 .....6

30 C.F.R. § 582.24 .....6

50 C.F.R. § 402.01(b) .....3

50 C.F.R. § 402.02 .....2, 3

50 C.F.R. § 402.12(a) .....3

50 C.F.R. § 402.13 .....3

50 C.F.R. § 402.13(c) .....3

50 C.F.R. § 402.14 .....3

50 C.F.R. § 402.14(a) .....3, 4

**Page(s)**

**CODE OF FEDERAL REGULATIONS (Continued)**

50 C.F.R. § 402.14(c)–(h) ....................4

**FEDERAL REGISTER**

48 Fed. Reg. 10605 (Mar. 14, 1983) ....................5

61 Fed. Reg. 4722 (Feb. 7, 1996) ....................7

91 Fed. Reg. 66352 (Oct. 20, 2026) ....................11, 23

**OTHER AUTHORITIES**

Secretarial Order 3451, *Establishment of the Marine Minerals Administration* (July 10, 2026) ....................5

U.S. Fish and Wildlife Serv, & Nat'l Marine Fisheries Serv., *Endangered Species Consultation Handbook* (1998) ....................4

# I. INTRODUCTION

The Marine Minerals Administration (MMA) issued a Final Leasing Notice to sell over 31 million acres of seabed off American Samoa for seabed mining in reliance upon an Endangered Species Act (ESA) Letter of Concurrence (LOC) that violates the law. The National Marine Fisheries Service's (NMFS) LOC omitted nearly all the effects of the agency action—excluding from its analysis the post-leasing activities that the Final Leasing Notice aims to generate. This Court will soon rule on the legality of the LOC in *Fa'asao Amerika Samoa v. NMFS* (*FAS*), Civ. No. CV-26-438 JAO-KJM. If this Court concludes that the LOC is "legally flawed," MMA's reliance on it to issue its Final Leasing Notice would violate MMA's duty under the ESA to ensure that its actions do not jeopardize ESA-listed species. *Wild Fish Conservancy v. Salazar*, 628 F.3d 513, 532 (9th Cir. 2010). Plaintiffs accordingly request that the Court hold unlawful and vacate MMA's Final Leasing Notice.[1]

[1] MMA's Final Leasing Notice, issued in reliance upon NMFS's LOC, adversely affects the professional, scientific, educational, aesthetic, spiritual, and cultural interests of Plaintiffs' members. *See* the Declarations of Pati Ah Young, Tuato'o-Bartley, Scanlan, Peters, Nakachi, and Zgliczynski, which are attached to Plaintiffs' Concise Statement, filed herewith. Plaintiffs bring this motion to protect their members' interests.

## II. STATUTORY FRAMEWORK

### A. Endangered Species Act

Congress enacted the ESA "to halt and reverse the trend toward species extinction, whatever the cost." *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 184 (1978). The ESA seeks to protect and recover imperiled species and populations by first listing them as threatened or endangered and designating "critical habitat" to protect areas that are essential to the species' survival and recovery. 16 U.S.C. § 1533(a).

Section 7(a)(2) of the ESA requires every federal agency, "in consultation with and with the assistance of" the expert wildlife agency—the U.S. Fish and Wildlife Service (FWS) or, as here, NMFS—to "insure that any action authorized, funded, or carried out by such agency … is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of [critical] habitat." *Id.* § 1536(a)(2).[2] If a federal action "may affect" any ESA-listed species or critical habitat, the agency proposing the action (the action agency) must complete a consultation with the

---

[2] To "jeopardize the continued existence" means "to engage in an action that reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species." 50 C.F.R. § 402.02. "Destruction or adverse modification means a direct or indirect alteration that appreciably diminishes the value of critical habitat as a whole for the conservation of a listed species." *Id.*

appropriate wildlife service to ensure compliance with section 7(a)(2)'s mandate. 16 U.S.C. § 1536(a)(2); 50 C.F.R. §§ 402.01(b), 402.13, 402.14. Consultation must analyze all effects of the entire agency action, which include "the direct and indirect effects of an action on the species or critical habitat, together with the effects of other activities that are interrelated or interdependent with that action." 50 C.F.R. § 402.02 (2018).[3]

Both the action agency and NMFS must "use the best scientific and commercial data available" when evaluating effects. 16 U.S.C. § 1536(a)(2). The action agency first prepares a biological assessment to "evaluate the potential effects of [its] action" and "determine whether [listed] species or [critical] habitat are likely to be adversely affected by the action." 50 C.F.R. § 402.12(a); *see* 16 U.S.C. § 1536(c)(1). If the action agency determines and NMFS concurs in writing that the action is "not likely to adversely affect" any listed species or critical habitat, "the consultation process is terminated, and no further action [under section 7(a)(2)] is necessary." 50 C.F.R. § 402.13(c); *see also id.* § 402.14(a), (b)(1).

---

[3] On March 30, 2026, the U.S. District Court for the Northern District of California held that the definition of "effects of the action" promulgated in 2019 was facially invalid and reinstated the definition that was in effect prior to 2019. *Ctr. for Biological Diversity v. U.S. Dep't of the Interior*, 837 F. Supp. 3d 1080, 1106, 1118 (N.D. Cal. 2026). The pre-2019 regulations apply to this case.

NMFS's concurrence letter must, at a minimum, document its own "analysis, based on review of all potential effects, direct and indirect." FWS & NMFS, *Endangered Species Consultation Handbook* 3-12 (1998) [hereinafter *ESA Handbook*];[4] *cf. Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.* (*BLM I*), 698 F.3d 1101, 1113 (9th Cir. 2012) (relying on ESA Handbook to determine "effects of the proposed action"). "[I]f any adverse effect to listed species may occur as a direct or indirect result of the proposed action or its interrelated or interdependent actions," NMFS is required to conclude that the action "[i]s likely to adversely affect" species. *ESA Handbook* 3-13.

If NMFS does not concur that the action is not likely to adversely affect listed species or critical habitat, then "formal consultation" is required. 50 C.F.R. § 402.14(a). Formal consultation involves a more comprehensive evaluation of the effects of the action and culminates in a "biological opinion" from NMFS on whether the action is likely to jeopardize the continued existence of the species or to destroy or adversely modify critical habitat. 16 U.S.C. § 1536(b)(3)(A); 50 C.F.R. § 402.14(c)–(h).

---

[4] For the Court's convenience, excerpts from the *ESA Handbook* are attached as Exhibit "1" to Plaintiffs' Concise Statement.

B. Outer Continental Shelf Lands Act

The Outer Continental Shelf Lands Act (OCSLA) governs the leasing, exploration, and development of minerals on the "Outer Continental Shelf." 43 U.S.C. § 1331 *et seq.* OCLSA defines the Outer Continental Shelf as the seabed extending from the outer boundary of state waters—typically three miles from shore—to the outer boundary of the United States' Exclusive Economic Zone, 200 nautical miles from shore. *Id.* §§ 1301(a)(2), 1331(a); 48 Fed. Reg. 10605, 10605 (Mar. 14, 1983). OCSLA authorizes MMA to sell "leases of any mineral other than oil, gas, and sulphur in any area of the outer Continental Shelf." 43 U.S.C. § 1337(k); *see* 30 C.F.R. § 581.0–.47.[5] A lease "authorizes exploration for, and development and production of, minerals." 43 U.S.C. § 1331(c).

Immediately upon receiving a lease, the holder may conduct "preliminary activities," which include "bathymetric, geological, geophysical, mapping, and other surveys." 30 C.F.R. § 582.21(d). Such activities are, by definition, "those which have no significant adverse impact on the natural resources of the OCS," *id.*,

[5] Until recently, the agency within the Department of the Interior with authority for OCSLA leasing was named the Bureau of Ocean Energy Management (BOEM). In July, the Secretary of the Interior merged BOEM and the Bureau of Safety and Environmental Enforcement into a single agency now called the Marine Minerals Administration. Secretarial Order 3451, *Establishment of the Marine Minerals Administration* (July 10, 2026), https://www.doi.gov/sites/default/files/document_secretarys_orders/so-marine-minerals-administration_final_508.pdf. While the applicable regulations and the record in this case refer to BOEM, this briefing will use MMA, the agency's current name.

but lessees are permitted to commence preliminary activities without obtaining MMA's approval that they meet that environmental standard.

Lessees then conduct further exploration, testing, development, and production activities on a lease "in accordance with a plan submitted by the lessee and approved by the Director" of MMA. *Id.* § 582.21(a). "Exploration" includes certain geophysical surveys, drilling, and sampling of mineral deposits. *Id.* § 582.3; *see id.* § 582.22. "Testing" includes "removing bulk samples for processing tests and feasibility studies and/or the testing of mining equipment." *Id.* § 582.3; *see id.* § 582.23. "Development" includes "geophysical activities, drilling, construction of offshore facilities, and operation of all onshore support facilities" for the purpose of producing minerals. *Id.* § 582.3; *see id.* § 582.24. And "production" is the mining and processing of minerals from the seabed. *Id.* § 582.24. While leases have a primary term of at least 20 years, they remain in effect beyond that term so long as minerals are being produced. *Id.* § 581.19.

## III. FACTUAL BACKGROUND

### A. Seabed Mineral Exploration and Extraction Activities Will Harm Imperiled Wildlife.

The waters around American Samoa are home to eighteen species that the ESA protects and that NMFS determined may be affected by MMA's planned lease sale: the endangered blue whale, fin whale, sei whale, sperm whale, green

sea turtle (Central South Pacific Distinct Population Segment (DPS)),[6] hawksbill sea turtle, loggerhead sea turtle (South Pacific DPS), and leatherback sea turtle, and the threatened olive ridley sea turtle, oceanic whitetip shark, giant manta ray, scalloped hammerhead shark (Indo-West Pacific DPS), chambered nautilus, and five species of coral (*Acropora globiceps*, *A. retusa*, *A. speciosa*, *Fimbriaphyllia paradivisa*, and *Isopora crateriformis*). Ex. 2: Feb. 2026 BA at N00437–42;[7] Ex. 3: LOC at N00545–46; Ex. 4: *Marine Protected Species of American Samoa*, NOAA Fisheries.[8] NMFS has designated critical habitat in American Samoa's coastal waters for all five ESA-listed coral species. Feb. 2026 BA at N00409–12, 441–42. And NMFS has identified more than forty additional species of ESA-listed whales, other marine mammals, sea turtles, and other marine animals that

---

[6] The ESA allows NMFS and FWS to separately list individual DPSs of species as threatened or endangered. *See* 16 U.S.C. § 1532(16) (defining "species" to include "any distinct population segment of any species of vertebrate fish or wildlife which interbreeds when mature"). NMFS identifies DPSs based on the population's "discreteness," "significance," and "conservation status." 61 Fed. Reg. 4722, 4725 (Feb. 7, 1996).

[7] In *FAS*, NMFS produced the administrative record for the LOC on which MMA relies for the American Samoa lease sale. Where Plaintiffs cite to documents that are in the *FAS* administrative record, they cite to the Bates-stamped page numbers.

[8] Plaintiffs request the Court take judicial notice of this document, which the Court may do because it is a publicly available government document located on NMFS's website. *See King v. Cnty. of Los Angeles*, 885 F.3d 548, 555 (9th Cir. 2018) (stating that courts may "take judicial notice of the undisputed and publicly available information displayed on government websites.").

may be affected by vessels traveling to and from American Samoa to engage in deep-sea mining. LOC at N00545–46; Feb. 2026 BA at N00436–42.

B. <u>NMFS Concludes Seabed Mining Leasing off American Samoa Will Not Adversely Affect ESA-Listed Species or Critical Habitat.</u>

On January 16, 2026, MMA requested "expedited informal consultation" with NMFS on MMA's "proposed action to issue up to two leases for the purpose of commercial mining." LOC at N00544. MMA sought NMFS's concurrence that its action "may affect, but is not likely to adversely affect" approximately 60 ESA-listed species, avoiding the need to engage in formal consultation under ESA section 7. *Id.* at N00545–56.

On February 3, 2026, MMA provided NMFS with a biological assessment (BA) in support of its request. Ex. 5: Apr. 2026 BA at N02853. The BA identifies the "action area"—the "areas to be affected directly or indirectly by the federal action"—as "waters nearby American Samoa where most of the Proposed Action will take place as well as waters near Hawaii and the west coast, where vessels may start their transit(s)." Feb. 2026 BA at N00352 (citing 50 C.F.R. § 402.02). Despite stating that the purpose of the lease sale is to "facilitate the potential development" of the seabed minerals to provide a "domestic supply of strategic minerals," *id.* at N00340, the BA limits the "effects of the action" to only "preliminary activities"; it completely omits effects from exploration, testing, development, and/or mining on leases. *See id.* at N00414–38, 453 (noting that

preliminary activities "would not result in commercial-scale disturbance"). This is even though the BA recognized that operation of mining equipment, whether during testing or extraction, releases harmful sediment plumes into the water column. *Id.* at N00347 ("Sediment plumes are a known concern from commercial-scale mining … ."); N00454 (stating collector-vehicle mining tests "disturb orders-of-magnitude" more sediment than preliminary activities).

The scope of preliminary activities includes the use of High-Resolution Geophysical (HRG) surveys (e.g., multibeam echosounders, side-scan sonar, and sub-bottom profilers), seabed sampling by ROVs, anchors on the seafloor for buoys and data collection instruments, and seabed box core sampling, among other actions. *Id.* at N00343–49. Acoustic surveys may be conducted 24 hours a day over several days. *Id.* at N00350. The BA identifies several ways in which these activities harm ESA-listed marine mammals, sea turtles, sharks, and rays, including: noise from surveys, aircraft, and vessels; vessel collisions; entanglement in mooring systems for buoys and deep-tow survey systems; disturbance to feeding or modified prey abundance; habitat disturbance; and release of pollutants and marine debris. *Id.* at N00345–47, 414–38. MMA nonetheless concluded the consequences of each effect would be "insignificant." *Id.* The BA also paradoxically concludes there will be "no effect" to ESA-listed corals but that their critical habitat may be affected because it "overlaps with the

Action Area." *Id.* at N00438, 441–42. Ultimately, the BA concludes the action "may affect but [is] not likely to adversely affect" any ESA-listed species or critical habitat. *Id.* at N00439.

On February 13, 2026, only ten days after receiving MMA's BA, NMFS issued a four-page letter concurring with MMA's determination. LOC at N00545–46. Like the BA, the LOC considers only preliminary activities; it does not contain any evaluation of the effects of exploration, testing, development, or production. *Id.* at N00544–45. And, of the effects from preliminary activities, the LOC discusses only acoustic impacts from surveys, ignoring all other potential impacts flagged in the BA. *Id* at N00545. As to impacts from acoustic surveys, the LOC concludes that impacts will be minimal because "equipment operating higher than 160 dB will not be permitted by [MMA]." *Id.* The LOC states that NMFS's concurrence "concludes informal consultation under section 7 of the ESA" for the proposed American Samoa lease sale. *Id.* at N00546.

In April 2026, MMA submitted an "updated BA" to NMFS to change MMA's "sound impacts analysis without changing any of the determinations." Ex. 6: N00548 (listing updated sections); *see generally* Ex. 7 (tracking changes from initial BA). NMFS did not make any changes to its LOC based on the April BA. Ex. 8: N01933.

C. MMA Issues a Final Leasing Notice for the American Samoa Lease Sale in Reliance Upon NMFS's LOC.

On October 20, 2026, MMA published its Final Leasing Notice in the Federal Register, announcing that it will lease over 31 million acres of seabed around American Samoa for mineral exploration and commercial mining activities. 91 Fed. Reg. 66352, 66353 (Oct. 20, 2026) (attached at Ex. 9: Final Leasing Notice).[9] MMA's lease sale is scheduled for November 19, 2026. *Id.* at 66352. Shortly before publishing the Final Leasing Notice, MMA finalized a decision memo stating that it issued the Final Leasing Notice in reliance upon the LOC. *See* Ex. 10: MMA FLN Decision Memo at 30.

## IV. PROCEDURAL HISTORY

On August 18, 2026, Plaintiffs Fa'asao Amerika Samoa and Conservation Council for Hawai'i (the *FAS* plaintiffs) filed suit in this Court, alleging that NMFS violated the ESA when it issued its LOC greenlighting MMA's lease sale. Compl., *FAS*, Civ. No. CV-26-438 JAO-KJM, ECF 1, PageID.86–90. The *FAS* plaintiffs promptly moved for summary judgment, and the Court held oral argument on the summary judgment motion on October 30, 2026. Pls.' Mot.

[9] The Final Leasing Notice, MMA Decision Memo, and Final Leasing Notice stipulations included at Exhibits 9–11 should be in MMA's administrative record. If the documents are not, the Court should take judicial notice of these government documents, which are available on MMA's website. *See King*, 885 F.3d at 555.

Summ. J., *FAS*, Civ. No. CV-26-438 JAO-KJM, ECF 15-1; Pls.' Reply Supp. Mot. Summ. J., *FAS*, Civ. No. CV-26-438 JAO-KJM, ECF 49; Entering Order, *FAS*, Civ. No. CV-26-438 JAO-KJM, ECF 55; Pls.' Supp. Mem., *FAS*, Civ. No. CV-26-438 JAO-KJM, ECF 61.

The same day the *FAS* plaintiffs sued NMFS, they sent MMA and Secretary Burgum a notice of intent to sue for, among other things, violating the ESA by relying on an unlawful LOC for the American Samoa lease sale. Ex. 12: Notice of Intent at N02658. MMA and Secretary Burgum received the notice letter on August 26, 2026. *See* Ex. 13: Confirmation of MMA Receipt; Ex. 14: Confirmation of Burgum Receipt.

On October 19, 2026, Plaintiffs filed the instant case against MMA and Secretary Burgum challenging the Final Leasing Notice. ECF 1. On October 26, 2026, after 60 days elapsed following Defendants' receipt of the *FAS* plaintiffs' notice letter, Plaintiffs amended their complaint to add the ESA claim. ECF 16.

During the LR 7.8 conference regarding their ESA claim, Plaintiffs asked Defendants to stipulate that MMA would postpone or cancel the November 19 lease sale if this Court rules in *FAS* that the LOC is unlawful. Eaton Decl. ¶ 16. Defendants declined to do so. *Id.* To prevent MMA from moving forward with an illegal lease sale that would prejudice their interests, Plaintiffs Fa‘asao Amerika

Samoa and Conservation Council for Hawaiʻi filed this motion on Plaintiffs' Sixth Cause of Action.[10]

V. STANDARD OF REVIEW

The APA governs review of agency decisions under the ESA. *BLM I*, 698 F.3d at 1109. Under the APA, an agency action is invalid if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Agency action is "arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 43 (1983). "[T]he agency must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Id.* (cleaned up). "[W]here the agency's reasoning is irrational, unclear, or not supported by the data it purports to interpret, [a court] must disapprove the agency's action." *Nw. Coal. for Alts. to Pesticides v. U.S. EPA*, 544 F.3d 1043, 1052 n.7 (9th Cir. 2008).

[10] Plaintiff Faleula o le Manuʻatele did not provide notice of intent to sue on this claim.

## VI. ARGUMENT

Section 7(a)(2) of the ESA requires MMA, in consultation with NMFS, to "ensure that its actions are not likely to jeopardize the continued existence of [ESA-listed species] or result in destruction or adverse modification of critical habitat." *BLM I*, 698 F.3d at 1127 (citing 16 U.S.C. § 1536(a)(2)). MMA must complete a lawful section 7 consultation with NMFS before holding the American Samoa lease sale. *E.g.*, *Sec'y of the Interior v. California*, 464 U.S. 312, 338 (1984) (stating that, before holding a lease sale, "[r]equirements of … the Endangered Species Act must be met first"); *Ctr. for Biological Diversity v. U.S. Dep't of Interior*, 563 F.3d 466, 483 (D.C. Cir. 2009) (stating lease sale stage "requires ESA consultation"). "If a project is allowed to proceed without substantial compliance with those procedural requirements, there can be no assurance that a violation of the ESA's substantive provisions will not result." *Thomas v. Peterson*, 753 F.2d 754, 764 (9th Cir. 1985), *abrogated on other grounds as recognized by Cottonwood Env't L. Ctr. v. U.S. Forest Serv.*, 789 F.3d 1075, 1092 (9th Cir. 2015).

Consultation concludes with either a letter of concurrence or a biological opinion from NMFS. If NMFS's written determination is "legally flawed," however, MMA cannot rely on it to satisfy its ESA section 7(a)(2) obligations. *BLM I*, 698 F.3d at 1128; *see also Ctr. for Biological Diversity v. U.S. Bureau of*

*Land Mgmt.* (*BLM II*), No. CV-24-00141-TUC-RM, 2026 WL 878924, at *9 (D. Ariz. Mar. 31, 2026).

In *FAS*, the parties have fully briefed and this Court has heard argument on the plaintiffs' claims that NMFS violated the ESA in issuing the LOC for the American Samoa lease sale. If the Court concludes in that case that the LOC is unlawful for any reason, that necessarily means that MMA violated the ESA by relying on the "legally flawed" LOC to issue its Final Leasing Notice. *BLM I*, 698 F.3d at 1128. Moreover, even if the Court in *FAS* were to uphold the LOC on the grounds that NMFS lacked authority either to deny its concurrence based on MMA's improper articulation of the agency action or to otherwise reject or redefine MMA's description of the action (a result that would be contrary to well established caselaw), MMA's Final Leasing Notice would still violate the ESA because MMA engaged in and relied on a consultation that failed to "consider all phases of the agency action, which includes post-leasing activities." *Conner v. Burford*, 848 F.2d 1441, 1453 (9th Cir. 1988). In either circumstance, the Court should vacate the Final Leasing Notice as unlawful under the ESA.

A. <u>MMA Violated the ESA by Relying on an Unlawful LOC.</u>

MMA issued its Final Leasing Notice in reliance on NMFS's LOC. *See* MMA FLN Decision Memo at 30. The LOC is legally flawed for the reasons presented to the Court in *FAS*. Namely, the LOC is flawed because it unlawfully

(i) omitted from its evaluation the very post-leasing activities that the American Samoa lease sale aims to generate; (ii) relied on unenforceable mitigation measures to justify its conclusions about the impacts of auditory survey equipment; and (iii) failed to address record evidence showing that even minimal marine debris is likely to adversely affect listed species in American Samoa. *See* Pls.' Mot. Summ. J., *FAS*, Civ. No. CV-26-438 JAO-KJM, ECF 15-1, PageID.123–133; Pls.' Reply Supp. Mot. Summ. J., *FAS*, Civ. No. CV-26-438 JAO-KJM, ECF 49, PageID.3153–3172.

MMA "cannot meet its section 7 obligations by relying on" a "legally flawed" LOC. *BLM I*, 698 F.3d at 1127–28; *see also BLM II*, 2026 WL 878924, at *9. Accordingly, if this Court in *FAS* holds the LOC unlawful for any reason, it necessarily follows that MMA violated section 7 by relying on the LOC for the Final Leasing Notice. *See Hawaii Longline Ass'n v. NMFS*, 281 F. Supp. 2d 1, 26–27 (D.D.C. 2003) (holding agency's reliance on a biological opinion that had been held invalid was arbitrary and capricious).

*Wild Fish Conservancy v. Salazar* is particularly instructive here, where MMA is relying on a consultation that did not evaluate "the effect of the *entire* agency action." *Conner*, 848 F.2d at 1453; *see* Pls.' Mot. Summ. J., *FAS*, Civ. No. CV-26-438 JAO-KJM, ECF 15-1, PageID.124–129; Pls.' Reply Supp. Mot. Summ. J., *FAS*, Civ. No. CV-26-438 JAO-KJM, ECF 49, PageID.3153–3164; Pls.'

Supp. Br., *FAS*, Civ. No. CV-26-438 JAO-KJM, ECF 61, PageID.3517–3523. In *Wild Fish*, the Ninth Circuit held that the action agency—the Leavenworth National Fish Hatchery (the Hatchery)—violated the ESA by relying on a biological opinion that was unlawfully limited in scope. 628 F.3d at 532. The Hatchery defined the action in its consultation request as "the operation and maintenance of the Hatchery" for only five years, *id.* at 519, and the consulting agency produced a biological opinion that "endorsed" that limited scope, *id.* at 522. The Ninth Circuit found the biological opinion unlawful because the consulting agency "committed legal error by limiting the scope of the action to five years." *Id.* at 532. The Court then held that "[t]he Hatchery's reliance on a legally flawed biological opinion was arbitrary and capricious" and violated the action agency's "substantive duty to ensure" that its action did not jeopardize ESA-listed species. *Id.*

As in *Wild Fish*, the action agency here (MMA) defined the action narrowly in a way that omits "all stages of the agency action." *Id*. at 525 (citation omitted). As in that case, NMFS "endorsed" that narrow definition and used it as the basis for its LOC. *Id.* at 522. And, as in that case, MMA's reliance on a consultation determination using an unlawfully narrow scope violates the MMA's "substantive duty to ensure" against jeopardy. *Id.* at 532. *Wild Fish* establishes that the appropriate relief in this case is to declare both the consultation document (the

LOC) and the agency action that relies on it (the Final Leasing Notice) unlawful. *Id.* at 532.

In addition to the fatal flaw in the scope of the agency action, NMFS unlawfully relied on non-binding and unenforceable mitigation of acoustic surveys to conclude in the LOC that preliminary activities are not likely to adversely affect any species. *See* Pls.' Mot. Summ. J., *FAS*, Civ. No. CV-26-438 JAO-KJM, ECF 15-1, PageID.132–133; Pls.' Reply Supp. Mot. Summ. J., *FAS*, Civ. No. CV-26-438 JAO-KJM, ECF 49, PageID.3170–3172. *Center for Biological Diversity v. Bernhardt* involved a similar situation, where FWS relied on insufficiently binding mitigation measures when evaluating effects under the ESA of MMA's (then known as BOEM) approval of an offshore drilling facility. 982 F.3d 723, 751 (9th Cir. 2020). The court held the biological opinion unlawful for relying on mitigation measures when there was "nothing to bind [MMA]" to implement them. *Id.* at 747, 751. And because it found the biological opinion unlawful, the court concluded MMA's "reliance on it is unlawful" and vacated MMA's approval of the project. *Id.* at 751.

As in *Bernhardt*, NMFS here relied on non-binding, unenforceable mitigation measures when reaching the conclusion that preliminary activities using auditory equipment are not likely to adversely affect listed species. *See* LOC at N00545 (assuming "equipment operating higher than 160 dB will not be permitted

by [MMA]"); Pls.' Mot. Summ. J., *FAS*, Civ. No. CV-26-438 JAO-KJM, ECF 15-1, PageID.132–133; Pls.' Reply Supp. Mot. Summ. J., *FAS*, Civ. No. CV-26-438 JAO-KJM, ECF 49, PageID.3170–3172. As in that case, there is "nothing to bind" MMA to impose limits on preliminary activities; it is "difficult to determine the point at which the action agency may renege on its promise to implement these measures." *Bernhardt*, 982 F.3d at 747. Even assuming that MMA made a "sincere general commitment" to impose mitigation in the BA, neither the lease stipulations nor regulations nor any other authority requires (or even expressly authorizes) MMA to enforce any limits. *See* Ex. 11: Final Leasing Notice Stipulation No. 2; 30 C.F.R. § 582.21. As in *Bernhardt*, the LOC is unlawful for relying on legally insufficient mitigation, and the Court should vacate MMA's Final Leasing Notice for relying on the unlawful LOC. *See* 982 F.3d at 751.

If the Court finds that NMFS's LOC is unlawful in *FAS*, then MMA's Final Leasing Notice also must be found unlawful for relying on the LOC to comply with MMA's ESA obligations.

B. <u>Even if the Court Does Not Find the LOC Unlawful, MMA Violated the ESA by Unlawfully Limiting the Scope of its Action.</u>

NMFS has argued in *FAS* that it was required to adopt MMA's unlawfully narrow articulation of the agency action and that NMFS lacked discretion to reject or recharacterize the definition to comply with the law or even to deny concurrence in MMA's "not likely to adversely affect" determination. NMFS is wrong, as

explained in the *FAS* plaintiffs' briefs. However, even if the Court holds in *FAS* that NMFS's LOC is lawful because NMFS was required to use MMA's cramped articulation of its action and was without discretion to deny concurrence, MMA's Final Leasing Notice still violates the ESA. Section 7(a)(2) mandates that MMA "insure" that its actions are not likely to jeopardize ESA-listed species, 16 U.S.C. § 1536(a)(2), and MMA "cannot abrogate its responsibility to ensure that its actions will not jeopardize a listed species" by relying on an unlawful LOC. *Res. Ltd., Inc. v. Robertson*, 35 F.3d 1300, 1304 (9th Cir. 1993) (cleaned up). Fulfilling this obligation requires completing a consultation that evaluates "the effect of the *entire* agency action." *Conner*, 848 F.2d at 1453. By limiting its consultation to only issuance of leases and preliminary activities, MMA violated this duty.

For a "lease sale under the Outer Continental Shelf Lands Act, … the 'agency action' encompasse[s] the entire leasing project, from the issuance of the leases through post-leasing development and production." *Id.* (citing *N. Slope Borough v. Andrus*, 642 F.2d 589, 608 (D.C. Cir. 1980)). For an OCSLA oil and gas lease, evaluation of the project "in the light of all contemplated and congruous actions merely reflects that 'pumping oil' and not 'leasing tracts' is the aim of congressional [OCSLA] policy." *N. Slope Borough*, 642 F.2d at 608. Likewise, for a deep-sea mining lease, "section 7 of the ESA on its face requires [NMFS] in this case to consider all phases of the agency action, which includes post-leasing

activities." *Conner*, 848 F.2d at 1453; *see also Pac. Rivers Council v. Thomas*, 30 F.3d 1050, 1054 (9th Cir. 1994) ("[T]here is little doubt that Congress intended to enact a broad definition of agency action in the ESA … ."). Thus, an action to hold an OCSLA lease sale violates section 7 if the ESA consultation on that sale excludes post-leasing activities. *See Conner*, 848 F.2d at 1453.

The Ninth Circuit's decision in *Conner* confirms this point. There, the Forest Service (the action agency) and FWS (the consulting agency) agreed to limit the scope of ESA consultation for the Forest Service's oil and gas lease sale to the issuance of leases only. *Id.* at 1444. Relying on OCSLA caselaw, the Ninth Circuit held the biological opinion unlawful for failing to "consider all phases of the agency action, which includes post-leasing activities." *Id.* at 1453. Because the "federal agencies"—both action and consulting—"violated the ESA by making lease sales without preparing a biological opinion which considers the effects of post-leasing oil and gas activities," the Ninth Circuit enjoined the Forst Service from selling leases. *Id.* at 1462.

Here, MMA is guilty of the same errors that the Forest Service made in *Conner*—unlawfully omitting "all phases of the agency action, which includes post-leasing activities," from its ESA consultation. *Id.* at 1453. Because MMA issued the Final Leasing Notice without evaluating "the effect of the *entire* agency

action" to ensure the American Samoa lease sale will not result in jeopardy to any listed species or adverse modification of critical habitat, it violated the ESA. *Id.*

This is true regardless of which agency is at fault for the LOC's unlawfully narrow scope. In *Resources Limited*, the Forest Service withheld information from FWS on the effects of its proposed action. 35 F.3d at 1304. Without deciding whether FWS's biological opinion was lawful, the Ninth Circuit held that "[t]he Forest Service's reliance on the FWS's opinion was not justified in light of its failure to provide the FWS with all of the data and information required by" law. *Id.* at 1305. So too here, MMA's reliance on NMFS's LOC is not justified in light of MMA's failure to articulate the proper, legally required scope of the action in its request for consultation and the absence of any analysis of post-leasing activities in MMA's biological assessment.

C. <u>The Court Should Vacate the Final Leasing Notice.</u>

The "default remedy under the APA" for an unlawful agency action is vacatur and remand of the action. *Mont. Wildlife Fed'n v. Haaland*, 127 F.4th 1, 50 (9th Cir. 2025). Accordingly, the Ninth Circuit vacates agency action taken in reliance upon an unlawful ESA consultation. *BLM I*, 698 F.3d at 1128 (vacating action agency's record of decision issued in reliance upon an unlawful biological opinion); *Bernhardt*, 982 F.3d at 751 (same).

In "limited circumstances," a court may instead remand without vacatur. *Mont. Wildlife Fed'n*, 127 F.4th at 50 (citation omitted). Whether circumstances warrant departure from vacatur "depends on how serious the agency's errors are 'and the disruptive consequences of an interim change that may itself be changed.'" *Id.* (citation omitted). Neither factor warrants remand without vacatur here.

MMA's and NMFS's errors are serious. The agencies completely omitted the bulk of effects of the action from their assessment. "There is no 'serious possibility that the [government] will be able to substantiate its decision'" on the scope of effects on remand because the law prohibits MMA and NMFS's approach. *Id.* at 51 (citation omitted) (alteration in original).

Moreover, vacatur would have minimal disruptive consequences, if any. MMA has not yet held its lease sale, which is scheduled for November 19, 2026. 91 Fed. Reg. at 66352. Vacating the Final Leasing Notice before that date and pending completion of lawful ESA consultation would allow MMA the time to comply with the law before any third-party companies reveal proprietary information and seek intervention in this case, sparing the Court, litigants, and even bidding companies from unnecessary burdens and complications. In other litigation over MMA's oil-and-gas lease sales, courts typically reach a decision against an agency only after a lease sale has occurred. That timing allows

companies who have purchased leases to intervene and argue that vacatur would be "highly disruptive for the lessees," who "have paid millions of dollars to obtain their leases." *Gulf Restoration Network v. Haaland*, 47 F.4th 795, 805 (D.C. Cir. 2022). The companies muddy the courts' vacatur analyses by claiming that "any redo of the lease sales" following the government's compliance with its statutory duties "'would be tainted by prior publication of [the] lessees' proprietary valuation of the leases' following the original sales." *Id.* (alteration in original); *see also Friends of the Earth v. Haaland*, 583 F. Supp. 3d 113, 159–60 (D.D.C. 2022) (describing argument that participants in illegal lease sale "will have disclosed their confidential valuation of unleased acreage, making their competitors fully aware of which tracts they have targeted for potential development as well as the valuation that they have placed on leasing those parcels" (cleaned up)), *vacated as moot*, 2023 WL 3144203 (D.C. Cir. Apr. 28, 2023). Because of these circumstances, a decision against the agency typically leads to extensive litigation over the proper remedy for the agency's illegal conduct.

But these circumstances do not exist here. No lease sale has occurred. And as a result, no such disruptive consequences exist. Instead, any potentially disruptive consequences can be completely avoided by vacating the Final Leasing Notice until MMA complies with its ESA obligations.

Accordingly, Defendants cannot meet their "burden to prove that vacatur is unnecessary." *Nat'l Parks Conservation Ass'n v. Semonite*, 422 F. Supp. 3d 92, 99 (D.D.C. 2019). The Court should vacate MMA's Final Leasing Notice.

## VII. CONCLUSION

"The ESA's procedural requirements call for a systematic determination of the effects of a federal project on endangered species" to prevent "a violation of the ESA's substantive provisions." *Conner*, 848 F.2d at 1457 n.40 (citation omitted). MMA failed to satisfy the ESA's requirements by "arbitrarily and capriciously relying on a faulty" LOC when issuing the Final Leasing Notice. *See BLM I*, 698 F.3d at 1127 (citation omitted). This Court should hold the Final Leasing Notice arbitrary and capricious and contrary to the ESA and its implementing regulations, and should vacate and remand the Final Leasing Notice.

DATED: November 6, 2026.

DAVID L. HENKIN
HARLEY M. BROYLES
EARTHJUSTICE
850 Richards Street, Suite 400
Honolulu, Hawai‘i 96813
T: (808) 599-2436
Email: dhenkin@earthjustice.org
hbroyles@earthjustice.org

/s/ Christopher D. Eaton
CHRISTOPHER D. EATON
(*pro hac vice*)
EARTHJUSTICE

810 3rd Avenue, Suite 610
Seattle, Washington 98104
T: (206) 343-7340
Email: ceaton@earthjustice.org

JOSEPH V. LANGKILDE III
(*pro hac vice*)
EARTHJUSTICE
1250 I Street NW, Fourth Floor
Washington, DC 20005
T: (202) 667-4500
Email: jlangkilde@earthjustice.org

Attorneys for Plaintiffs
Faleula o le Manuʻatele, Faʻasao Amerika Samoa, and Conservation Council for Hawaiʻi